**EXHIBIT A-1**

EOD    APR /- 2003

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

APR 04 2003

KENNETH S. GARDNER, CLERK
P8 REP. - L8

In re:

KMART CORPORATION, et al.,

                    Debtors

)
)
)
)
)
)
)
)

Chapter 11
Case No. 02-B02474
Hon. Susan Pearson Sonderby

(Jointly Administered)

## OBJECTION OF HARVARD REAL ESTATE-ALSTON, INC. TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF KMART CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION AND "ASSUMPTION OBJECTION" OF HARVARD REAL ESTATE-ALSTON, INC.

Harvard Real Estate-Alston, Inc., successor by merger to Harrow Corporation

("Harvard"), landlord of premises in Brighton, Massachusetts (Kmart Corporation Store #9424),

hereby (i) objects to confirmation of the First Amended Joint Plan of Reorganization of Kmart

Corporation and its Affiliated Debtors and Debtors-in-Possession ("Plan") and (ii) objects to the

assumption by Kmart Corporation (together with its affiliated Debtors and Debtors-in-

Possession, "Debtor") of that certain Lease dated as of January 26, 1978 between Paul A. Faraca

and Marvin Shiller, as Trustees, under declaration of trust dated June 15, 1977 and Caldor, Inc.

Mass, as amended, as assigned to the Debtor pursuant to Assignment and Assumption

Agreement dated July 1, 1999 between The Caldor Corporation and Kmart Corporation pursuant

to an Order of the United States Bankruptcy Court for the Southern District of New York in *In re*

*Caldor, Inc.-NY, The Caldor Corporation, and Caldor Corporation, Inc.-CT, et al,* Debtors,

Chapter 11 Case No. 95-B44080 (JLG) dated June 24, 1999 ("Lease").

{J:\CLIENTS\ban\0823020\16\00349537.DOC;1}

10044

In support of its objection to Plan confirmation and its objection to the Debtor's attempted assumption of the Lease, Harvard states:

## BACKGROUND

1.    The Debtor commenced these jointly administered reorganization proceedings by filing voluntary petitions for relief on January 22, 2002 ("Petition Date") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq (the "Bankruptcy Code").

2.    The Debtor operates its discount retail business at the one-story building containing approximately 62,500 square feet of ground floor area and approximately 7,800 square feet of mezzanine area at the property known as the Brighton Mills Shopping Center, Brighton, Massachusetts 02135 ("Leased Premises"). The Debtor has remained in possession of the Leased Premises since the Petition Date. Since prior to the Petition Date and continuing through the present the Debtor has been in default of its obligations under the Lease. Harvard's records show that the Debtor has failed to pay pre-petition charges under the Lease of $29,224.95 and post-petition charges under the Lease totaling $23,922.67.

3.    On February 25, 2003 the Court approved the Disclosure Statement with respect to First Amended Joint Plan of Reorganization of Kmart Corporation and its affiliated debtors and debtors-in-possession ("Disclosure Statement") and entered an Order approving (I) Disclosure Statement (II) Record Date, Voting Deadline and Procedures for Temporary Allowance of Certain Claims (III) Procedures for Filing Objections to Plan (IV) Solicitation Procedures for Confirmation; and (V) Hearing Date to Consider Confirmation Date of the Plan (the "Order"). The Order sets April 4, 2003 as the deadline for the filing and service of objections to confirmation of the Plan ("Objection Deadline").

4.      According to a letter dated March 28, 2003 from the Debtor to "all parties to unexpired leases or executory contracts to be assumed", which letter was received by Harvard's property management agent on March 31, 2003, the Debtor filed various exhibits to the Plan on March 28, 2003 ("Plan Exhibits"). According to the March 28, 2003 letter, the Debtor intends to assume all unexpired leases and executory contracts that are listed on the Plan Exhibits. The Debtor did not serve Harvard with copies of any Plan Exhibits despite Harvard's counsel's Notice of Appearance and Request for Service of Papers filed with the Court on February 13, 2002. Harvard did not receive a copy of Plan Exhibit L-3 until April 2, 2003 despite its efforts to download those Plan Exhibits from PACER.[1]

## JURISDICTION

5.      The Court has jurisdiction over these objections pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409. The basis for Harvard's objections are 11 U.S.C. §§ 105, 365, 1126 and 1129 and Rules of Bankruptcy Procedure 3018, 9013 and 9014.

## ASSUMPTION OBJECTION

6.      On January 24, 2003 the Debtor attempted to extend the term of the Lease "for an additional term of five (5) years, commencing February 1, 2004, to and including January 31, 2009". See January 24, 2003 letter from Kmart Corporation by Michael Elliot, Vice President Real Estate to Harrow Corporation attached hereto as Exhibit "A". At the time of its purported extension of the lease term, the Debtor was in default of its obligations under the Lease. The Lease provides in pertinent part:

---

[1] It is unreasonable for the Debtor to delay filing of the Plan Exhibits leaving parties in interest with less than 5 business days before the Objection Deadline to determine their rights under the Plan. Harvard reserves the right to supplement this Objection.

> If Tenant shall give notice of the exercise in the manner and within
> the time provided aforesaid, the term shall be extended upon the
> giving of a notice without the requirement of any action on the part
> of Landlord. Notwithstanding the foregoing provisions of this
> Section (B), if at the time of the exercise of any of the aforesaid
> elections to extend the original term of this lease or at the time of
> the commencement of the aforesaid extensions, Tenant shall be in
> default of any of its obligations or agreements in this lease
> contained beyond any period herein provided for the curing of such
> default, then if Landlord shall so elect, the exercise of such election
> by Tenant shall be deemed null and void or the extension period
> shall not commence, as the case may be, and the term of this lease
> shall expire upon the date herein provided for such expiration
> absent the exercise of such election by Tenant.

Lease, Section 4(B), Page 11. (A copy of the Lease is attached to the original of this objection as

Exhibit "B"). Section 13(A)(i) of the Lease provides that:

> If Tenant shall default in the payment of any rent or any other sum
> of money payable by Tenant to Landlord and if Tenant shall fail to
> cure said default within fourteen (14) day [sic] after receipt of
> notice of said default from Landlord . . . on the fifth day next
> following the date of the sending of the notice the term of this
> Lease shall terminate, Tenant hereby waiving all rights of
> redemption.

Exhibit "B", Page 30.

7.    From April 2001 through the Petition Date the Debtor failed to pay Harvard

common area maintenance charges, real estate taxes and work orders payable under the Lease

totaling $29,224.95. Notice of the failure to pay those sums was provided to the Debtor by

Harvard's property manager, Beal and Companies, Inc. ("Beal"), from May 2001 through

December 2002 by virtue of Statements issued to the Debtor. From and after December 31, 2002

Harvard itself has provided statements to the Debtor which notify the Debtor that its past due

common area maintenance charges, real estate taxes and other charges under the Lease total

$53,147.62 through March 31, 2003. Ample notice to the Debtor having been given by Beal and

by Harvard of the ongoing defaults under the Lease, the Debtor's attempted extension of the lease term is null and void. See Lease, Section 4(B), Page 11.[2]

8.      11 U.S.C. §365(d)(3) requires that a debtor-in-possession "timely perform *all* the obligations of the debtor . . .arising from and after the order for relief under any unexpired lease of nonresidential real property". See 11 U.S.C. §365(d)(3)(emphasis added). Assuming *arguendo* that the Lease was not terminated by its own terms prior to the Petition Date, the Debtor's failure and refusal to timely perform its obligations under the Lease from and after the Petition Date bar it from attempting to extend the lease term. In re J.T. Rapps, Inc., 225 B.R. 257 (Bankr. D. MA. 1998). The Debtor's attempted extension of the term of the Lease is null and void.

9.      The Debtor's ongoing and continual failure to honor its obligations under the Lease preclude it from extending the lease term. Harvard is entitled to the immediate payment of all post-petition common area maintenance charges, work orders, real estate taxes and other charges payable under the Lease. In re J.T. Rapps, Inc., supra at 262-263; In re Coastal Dry Dock & Repair Corp., 62 B.R. 879, 883 (Bankr. E.D. NY. 1986). See 11 U.S.C. §365(d); 11 U.S.C. §§503(b) and 507(a)(1).

## OBJECTION TO PLAN CONFIRMATION

10.      Harvard objects to the confirmation of the Plan. Plan Exhibit L-3 proposes to treat the Lease as an unexpired lease to be assumed upon the Effective Date of the Plan. Among the findings that a Bankruptcy Court must make if it is to confirm a plan is a finding that the plan "proponent complies with the applicable provisions of this title [Title 11]." See 11 U.S.C. §1129(a)(2). If the plan proponent has not complied with the applicable provisions of Chapter

---

[2] This presupposes, of course, that the Debtor had the option to extend the Lease term at the time of its purported exercise.

11, the plan cannot be confirmed. Here, by its failure and refusal to pay Harvard the rent due under the Lease the Debtor has failed to comply with the provisions of 11 U.S.C. §365(d)(3). Moreover, the Debtor has failed to comply with the explicit provisions of this Court's "Order Pursuant to 11 U.S.C. §365(d)(4) Extending Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property" [Docket No. 1551] dated March 15, 2002 ("Pending assumption of any Unexpired Lease that is the subject of this Order, the Debtors shall timely perform all of their obligations under such Unexpired Lease as required by §365(d)(3) of the Bankruptcy Code . . ."). The Court should deny confirmation of the Plan.

11.     Plan Exhibit L-3 and the Debtor's March 28, 2003 letter to parties in interest presuppose that the Lease is an "unexpired lease." Harvard believes that the Statements submitted by Beal to the Debtor well-prior to the Petition Date constitute notice of default and notice of termination within the meaning of Section 13(A) of the Lease. If the Court agrees, the Lease was terminated prior to the Petition Date, and there is no Lease to assume and no lease term to extend. The Debtor is a tenant-at-will.

12.     Confirmation of the Plan should be denied. The Leased Premises are located in a shopping center. Pursuant to 11 U.S.C. §365(b)(3) the Debtor must adequately assure future performance under the Lease and that adequate assurance includes, without limitation, demonstration that any percentage rent due under the Lease will not decline substantially. Neither the Disclosure Statement nor the Plan make any demonstration whatsoever as to the Debtor's obligation to pay percentage rent under the Lease. No adequate assurance of future performance is set forth in the Plan. Even if there were a Lease to assume, the Debtor's refusal to honor its post-petition obligations under the Lease is a clear indication of its inability to assure Harvard of future timely performance of its Lease obligations.

WHEREFORE, Harvard Real Estate-Alston, Inc. objects to the attempted assumption by Kmart Corporation of the lease of the premises in Brighton, Massachusetts (Kmart Corporation Store #9424), and prays that the Court find that the Debtor's attempted extension of the lease term is null and void, that the Court order the Debtor to make immediate payment to Harvard of all post-petition common area maintenance charges, real estate taxes, work orders and other charges payable under the Lease, that the Court deny confirmation of the Plan, and for such other relief as the Court deems proper and just.

HARVARD REAL ESTATE-ALSTON, INC.
By its attorneys,

Richard A. Sheils, Jr. (BBO # 457290)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01601-0156
(508) 791-3511
(508) 929-3047 fax

Dated: April 3, 2003

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| KMART CORPORATION, et al., | ) | Chapter 11 |
| | ) | Case No. 02-B02474 |
| | ) | Hon. Susan Pearson Sonderby |
| Debtors | ) | |
| | ) | (Jointly Administered) |

## CERTIFICATE OF SERVICE

I, Richard A. Sheils, Jr., hereby certify that on this 3RD day of April 2003 I served a copy of the Objection of Harvard Real Estate-Alston, Inc. to First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors-In-Possession and "Assumption Objection" of Harvard Real Estate-Alston, Inc. to the following parties by way of Federal Express:

Counsel to the Debtors
John Wm. Butler, Jr., Esq.
J. Eric Ivester, Esq.
Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

Counsel to the Official Unsecured Creditors'
Committee
Glenn B. Rice, Esq.
Scott L. Hazan, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169

Counsel to the Official Unsecured Creditors'
Committee
Matthew J. Botica, Esq.
Winston & Strawn
35 West Wacker Drive
Chicago, Illinois 60601-9703

Counsel to the Official Financial Institutions'
Committee
Richard M. Cieri, Esq.
Jones, Day, Reavis & Pogue
901 Lakeside Avenue
Cleveland, Ohio 44144-1190

Counsel to the Official Financial Institutions'
Committee
Paul E. Harner, Esq.
Ray C. Schrick, Esq.
Jones, Day, Reavis & Pogue
77 West Wacker Drive
Chicago, Illinois 60601-1692

Counsel to the Official Committee of
Equityholders
Randall L. Klein, Esq.
Goldberg, Kohn, bell, Black, Rosenbloom &
Moritz, Ltd.
55 East Monroe Street, Suite 3700
Chicago, Illinois 60603

Counsel to the Debtors' Prepetition Lenders
Peter V. Pantaleo, Esq.
Simpson, Thatcher & Bartlett
425 Lexington Avenue, 24th Floor
New York, New York 10017

Counsel to the Plan Investors
Scott K. Charles, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Office of the United States Trustee
Kathryn Gleason, Esq.
227 West Monroe, Suite 3350
Chicago, Illinois 60604


and by way of first class mail postage pre-paid to those listed below:

Richard A. Sheils, Jr.



Kmart Corporation
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

January 24, 2003

**CERTIFIED MAIL – RRR**
#7002 0860 0002 1568 0029

**FEDERAL EXPRESS OVERNIGHT**

Harrow Corporation
c/o The Beal Companies, LLP
   Mr. Paul A. Faraca
177 Milk St.
Boston, MA  02109-3410

> Re:  Lease dated January 26, 1978 for
>       the premises located in Brighton, MA
>       and known as Kmart #9424

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing February 1, 2004, to and including January 31, 2009, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Please be advised that this election does not constitute an assumption of the Lease, and the undersigned reserves all rights under bankruptcy law.

Sincerely,

KMART CORPORATION

By _____
   Mike Elliott
   Vice President Real Estate

ME/cjl

cc:    P. Briskey
       J. Catlin
       F. Durzie
       C. Houck
       D. Hurley
       C. Lapensee
       J. York
       K. Zahra
       Corres. File
       Lease File

AGREEMENT

January 26, 1978

1.  Reference is made to Lease dated of even date herewith between Paul A. Faraca, and Marvin Shiller, as Trustees under Declaration of Trust dated June 15, 1977, to be recorded with the Suffolk County Registry of Deeds, as landlord ("Landlord"), and Caldor, Inc. Mass., a Massachusetts corporation, as tenant ("Tenant"), with respect to certain premises located in a Shopping Center on Western Avenue in Boston (Brighton District), Massachusetts, which premises are more fully described therein.

2.  Notwithstanding anything contained to the contrary in said lease, the parties hereby agree that during the first ten (10) years, commencing after rent day (defined in said Lease), Landlord shall perform the common areas maintenance obligations set forth in Section (D) of Article 2 of said Lease, at its sole cost and expense, and Tenant shall make no contribution thereto, except for lighting beyond midnight as therein provided, and except as provided in the following sentence.  Tenant shall reimburse Landlord each year, upon being billed therefor, for Tenant's share of the public liability insurance maintained with respect to the common areas, as computed in Section (I) of Article 2 of said Lease; except that if in any such year Tenant's share of such common areas maintenance (excluding the cost of public liability insurance) shall be less than the product of (i) $.25. and (ii) the number of square feet of ground floor area within the original demised premises, excluding the addition, then the amount of the difference (the "Credit") shall be credited against Tenant's share of the public liability insurance for such year.

Within a reasonable time after the expiration of each such year, Landlord shall furnish Tenant with a bill showing what would have been Tenant's share of the common areas maintenance cost (excluding the cost of public liability insurance on the common areas for which Tenant shall have a reimbursement obligation as hereinabove provided) for said year as provided in Section (I) of Article 2 of said Lease.  If, subsequently, an abatement is received in the real estate taxes upon the Shopping Center for any tax year falling wholly or partly within any of said first ten (10) years, then as a first charge against Tenant's share of any such abatement, after first deducting the cost of obtaining such abatement, Landlord shall receive a sum equal to the amount Tenant was hereby excused from paying to Landlord during the tax
including the Credit, if any,
until so used up such amounts
year for which said abatement was received and during all prior tax years.  If

-2-   Next page is Page 1A.

Tenant's share of any such abatement shall exceed the sum set forth in the immediately preceding sentence, then to the extent of such excess, Tenant shall not thereafter be excused from paying any sum to Landlord by reason of this Agreement, but after all of such excess shall have been so paid to Landlord, thereafter Tenant shall be so excused during the remainder of the aforesaid ten-year period.

HERE ENDS THIS PAGE.

-1A-   Next page is Signature Page.

3. Except as expressly modified herein, said Lease shall remain unmodified and in full force and effect.

4. This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; except that the provisions of this instrument shall not be binding upon the holder of any institutional first mortgage on all or any part of the Shopping Center, or anyone claiming by, through or under such holder.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as a sealed instrument as of the day and year first above written.

_Paul A. Paraca_
Paul A. Paraca, As Trustee As
Aforesaid And Not Individually

_Marvin Shiller_
Marvin Shiller, As Trustee As
Aforesaid And Not Individually

CALDOR, INC. MASS.

By _Harold Kanus_
Vice , President

ATTEST:

By _Ela Kulli_
, Secretary

(Corporate Seal)

The provisions of the foregoing
Agreement are hereby
accepted and confirmed:

CALDOR, INC.

By _Harold Kanus_
Vice , President

ATTEST:

By _Ela Kulli_
, Secretary

(Corporate Seal)

---

LEASE dated as of  January 26,     , 1978 between Paul A. Paraca and Marvin Shiller, as Trustees, under Declaration of Trust dated June 15, 1977, to be recorded with the Suffolk County Registry of Deeds.

—————————————————————————————; as Landlord (hereinafter called "Landlord"), and Caldor, Inc. Mass., a Massachusetts corporation, as tenant (hereinafter called "Tenant").

## W I T N E S S E T H :

PREMISES    1.  In consideration of the rents, agreements and conditions herein reserved and contained on the part of Tenant to be paid, performed and observed, Landlord does hereby demise and lease to Tenant, for the term hereinafter set forth, premises hereinafter described ("the demised premises") within the shopping center hereinafter described ("the Shopping Center") in  Boston, Massachusetts, together with the right to use   a reasonable area for loading and unloading adjacent to each service door of the demised premises.  The Shopping Center consists of the land (and all improvements that may from time to time be thereon) represented by the area outlined by a bold line upon a certain plan ("the lease plan") attached to this lease and marked Exhibit A.  The Shopping Center is more particularly described in Exhibit A-1 attached hereto.  The demised premises consist of (i) a  one-story building containing approximately 62,500   square feet of ground floor area, and approximately 7,800   square feet of mezzanine area, some of which space was formerly occupied by Turn-Style, which building shall be in the location designated on the lease plan as "Caldor" and (ii) the land immediately thereunder.

                                              from time to time
TER-      2.  (A)  All areas of the Shopping Center that do not contain buildings
LATION
ETE       shall be known as "common areas" of the Shopping Center.  Landlord agrees that
THE
PREMISES  a suitable loading area will be provided adjacent to the service doors of the demised premises and that at all times, except for temporary causes beyond the reasonable control of Landlord, there will be free and uninterrupted access from Western Avenue to the common area and all doors of the demised premises both for pedestrians and motor vehicles.

The parking spaces, driveways and footways in the Shopping Center, the entrances and exits of the Shopping Center, and the traffic flow pattern of the Shopping Center shall be as shown on the lease plan, but Landlord may change them from time to time; provided that any material changes therein shall be subject to Tenant's approval, which approval Tenant agrees not unreasonably to withhold or delay. ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Tenant hereby agrees that except for a sign to be erected and maintained upon the parapet of the demised premises as shown on the plans referred to in Exhibit B attached hereto and made a part hereof, no sign shall be erected upon the exterior of the demised premises without the prior written consent of Landlord, which consent Landlord hereby agrees it shall not unreasonably withhold. It is further understood and agreed that, except for signs permitted to be erected pursuant to presently existing leases, during the term of this lease no sign on any store in the Shopping Center (including the demised premises) may be a flashing sign, an intermittently lighted sign or have characters which are intermittently lighted. Landlord agrees that during the term of this lease no buildings will be erected in any areas of the Shopping Center, except as provided in Article 31 hereof, ████████████ ████████████████████████████ without the written consent of Tenant, which consent Tenant agrees it shall not unreasonably withhold or delay.

HERE ENDS PAGE.

-2-

Except as provided in Article 32 hereof,
(B) Landlord agrees that, except as may be permitted by the terms of presently existing leases to other tenants, no part of the Shopping Center will be used for storage purposes (it being understood that the use of portions of buildings upon the Shopping Center for storage incidental to retail operations being conducted therein shall not be deemed a use for "storage purposes"). Tenant agrees that no part of the demised premises will be used ████████████████████ for storage purposes (it being understood that the use of portions of the demised premises for storage incidental to retail operations being conducted therein shall not be deemed a use for "storage purposes"). Tenant hereby agrees that notwithstanding anything herein contained to the contrary and without in any way enlarging upon the purposes for which the demised premises may be used as hereinafter set forth, neither the demised premises nor any part thereof shall be used: (i) for the sale of gasoline and/or a gasoline service station, (ii) for the sale of alcoholic beverages, (iii) for the operation of a restaurant, or other eating place other than the type of snack bar described below, ████████████████████████ ████████████████████████████████████ or (iv) any combination of the foregoing categories. Notwithstanding the foregoing provisions hereof, subject to applicable law, the demised premises may contain a stand-up snack bar, provided that the main business thereof shall not be the sale of ice cream, sandwiches, and luncheons similar to that of premises of the sort now operated under the tradename "Friendly" or "Brighams". In addition, neither the demised premises nor any part thereof will be used for the operation of (i) a so-called supermarket or self-service grocery store; (ii) a grocery store or department; (iii) a meat market or department; (iv) a produce market or department; (v) a milk and ice cream store or department; (vi) a bakery store or department; (vii) a delicatessen or department devoting more than 2,000 square feet of floor area to the sale of food for consumption off the premises; or (viii) any

-3-

combination of the foregoing. Nothing hereinabove contained, however, shall be deemed to prohibit the demised premises from being used for the sale of candy, cookies and/or confections. Finally, each of Tenant and Landlord agrees that no portion of the demised premises or the rest of the Shopping Center, respectively, shall be used for a manufacturing use or a bowling alley, except and except as provided in Article 32 hereof, as may be permitted by the terms of presently existing leases to other tenants.

In addition, Landlord agrees that, except as may be permitted by the terms of and except as provided in Article 32 hereof, presently existing leases to other tenants, the building areas of the Shopping Center shall not be used for any purpose except for the operation of retail stores and service establishments of the sort customarily found in shopping centers.

(c) Tenant and all persons having business with Tenant shall have the right to use, in common with all other tenants of the Shopping Center and all persons having business with such other tenants, all parking areas, driveways and footways of the Shopping Center, except only that adjacent to each service door of any store a reasonable area may be reserved for the exclusive use of said store for loading and unloading, and except for reasonable "drive-up lanes" and parcel pick-up areas. It is expressly understood and agreed, however, that the owner of land adjacent to the Shopping Center may be granted, for the benefit of said adjacent land, rights of access over the driveways of the Shopping Center and utilities easements therein. Tenant agrees that, notwithstanding anything to the contrary contained in this lease, the granting of such rights of access and utilities easements shall not be deemed to violate the provisions of this lease. (See Article 31.)

(b) Tenant agrees that it will keep in repair all common areas of the Shopping Center and the lighting system and the drainage system serving said

-4-    Next Page is Page -4A-

common areas, that it will keep the parking areas and driveways suitably paved and marked for parking and traffic flow, that it will keep all common areas reasonably free of refuse and obstruction and reasonably free of snow and ice to the extent required by the business operations of the stores within the Shopping Center, that it will keep the common areas adequately lighted during regular shopping center hours, including without limitation, during all times when the adjacent premises in the Building (defined in Section 6(A)) shall be open for business and for a reasonable period of time thereafter. If the common areas are lighted beyond midnight for Tenant's use only, the utility charges therefor shall not be considered part of the common areas maintenance cost, and Tenant shall pay such cost. If the common areas are lighted beyond midnight for the use of any other premises only, the utility charges therefor shall not be considered part of the common areas maintenance cost, and Landlord shall pay such cost. If the common areas are lighted beyond midnight for Tenant's use and the use of other tenants of the Shopping Center who shall remain open so as to require

HERE ENDS PAGE

-4A-

such lighting beyond midnight, the utility charges therefor shall not be considered part of the common areas maintenance cost, and Tenant shall pay Tenant's share of such cost. Tenant share of such cost shall be determined in accordance with the provisions of Section (I) of this Article, but the denominator of the fraction therein described shall be the number of square feet of floor area within such premises of the Shopping Center who shall so remain open for business so as to require such lighting      (floor area being counted as provided in said Section). Tenant  will maintain public liability insurance with respect to the common areas in a single-limit amount of not less than One Million Dollars ($1,000,000.00) per occurrence, and $250,000.00 property damage and such insurance shall name Landlord as an additional insured. Said insurance shall also by contractual endorsement insure the obligations assumed by Tenant in the next sentence.  Tenant agrees to save any occupant of premises in the Shopping Center harmless from, and indemnify such occupant against, any and all injury, loss or damage, or claims for injury, loss or damage of whatever nature to any person or property in the common areas of the Shopping Center, unless occasioned by the act or negligence of such occupant or its employees or agents. Tenant shall deliver such policies to Landlord at least fifteen (15) days prior to the rent day, and each renewal policy at least fifteen (15) days prior to the expiration of the policy it renews.  Tenant  may maintain such insurance under a blanket policy affecting the Shopping Center   and other premises of Tenant   or any business organization affiliated with Tenant.   In lieu of delivering any policy of insurance to Landlord, Tenant  may deliver to Landlord a certificate of the company issuing such policy certifying such independent insurance or certifying the existence of a blanket policy showing the coverage, and that Landlord is named as an additional insured, and showing the aforesaid contractual coverage. The insurance required hereinabove may be provided by a basic policy of lesser liability provided an adequate "umbrella policy" is written for the deficiency. All such insurance policies shall provide that such policies shall not be cancelled or amended without at least ten (10) days prior written notice to Landlord. Tenant's costs in connection with this Section, plus any other costs specified in this lease to be part of the common areas maintenance cost, shall be known as the

-5-

"common areas maintenance cost".  In no event shall the common areas maintenance cost include any so-called supervisory or management fee.

                                 subject to the provisions of existing leases
     Notwithstanding the provisions of the foregoing paragraph/each lessee in the Shopping Center (including Tenant) shall be required to keep the sidewalk immediately adjacent to its premises, if any, free and clear of snow, ice, refuse and obstructions.  Also, if any major repairs shall be required to the parking lot of the Shopping Center prior to the second anniversary of the rent day, Landlord shall make such major repairs at Landlord's sole cost and expense, and the cost thereof shall not be deemed to be part of the common areas maintenance cost. The foregoing sentence shall not apply to striping.

     (E)  Landlord may make reasonable rules and regulations for the operation of the common areas, including, but without limitation, to designate certain areas for employee parking. Tenant agrees that it shall comply with such rules and regulations. Any such designated employee parking area shall be shown on a plan and be reasonably satisfactory to Tenant.

     (F)  Intentionally Omitted.

     (G)  Without in any way enlarging upon the purposes for which the demised premises may be used as set forth in Section (J) hereof, Tenant further agrees that neither the demised premises nor any part thereof will be used XXXXXXXXXXX XXXXXXXXXXXXX, as a theater, or for the conduct of banking operations, but this provision shall not preclude cashing of checks, extensions of credit and such other activities as are normally conducted in a department store or discount department store in connection with its operations.  As used hereinabove "banking/operations" means the operation of a business consisting principally of banking, loaning money, accepting monies for deposit, or operation of a building and loan, or savings and loan association.

     (H)  For each year of the term of this lease in which Tenant performs the common areas maintenance, Landlord shall pay to Tenant, Landlord's share of the common areas maintenance cost (determined as hereinafter provided) upon being billed therefor from time to time (but not more frequently than monthly) by Tenant. As used herein, the phrase "Landlord's share of the common areas maintenance cost" for any period shall mean the product of the common areas maintenance cost for such period and a fraction the numerator of which is the number of square feet of floor area within all buildings within the Shopping Center other than the demised premises and the denominator of which is the number of square feet of floor area within all buildings within the

-6-

Shopping Center.  (Floor area of mezzanines to the extent used for offices or
storage incidental to ground floor retail operations shall not be counted; other
mezzanine floor area, basement floor area and upper story floor area shall be
counted at half actual area; and/the floor area of the addition to the demised
premises erected by Tenant shall not be counted.)  If floor area shall change
during any year, a proper adjustment shall be made.  Tenant agrees that, upon
request by Landlord, Tenant shall furnish Landlord/with copies of invoices with
respect to items claimed to be part of the common areas maintenance cost and
shall permit Landlord or its designees to examine Tenant's books of account with
respect thereto at reasonable times during normal business hours.

(1)  Tenant agrees that Landlord shall have the right, at its election, to
assume and perform the obligations of Tenant set forth in Section (D) of this
Article by giving notice to Tenant of the exercise thereof at least three (3)
months prior to the date that Landlord shall elect to assume and perform the
same.  It shall be a condition of the exercise of the aforesaid right that
Landlord shall agree in writing with Tenant to assume any contract (other
than any insurance policy or policies) with any person or business organization
not affiliated with Tenant to which Tenant may then be a party providing for
the performance by such person or business organization of any of the obligations
of Tenant in said Section (D) contained.  Tenant agrees to furnish to Landlord
a copy of each such contract within a reasonable time after Landlord shall
request the same from Tenant.  Notwithstanding the preceding provisions of this
paragraph, it is expressly understood and agreed that Landlord shall only have
the right to assume and perform the aforesaid obligations of Tenant if:

(a)  The cost of Tenant performing said obligations shall exceed reasonable
and ordinary costs for the maintenance of similar shopping centers; or

(b)  Tenant shall fail to perform the same in accordance with usual and
customary practice for similar shopping centers; or

(c)  Tenant shall have discontinued operations of its store in the
demised premises or shall have assigned its lease or sublet the demised premises.

In the event of any dispute between Landlord and Tenant with respect to
the matters set forth in the immediately preceding sentence, the same shall be
resolved by arbitration.

If Landlord shall perform the obligations set forth in Section (D) of
this Article, Landlord shall not be required to name Tenant as an additional
insured under the public liability insurance set forth therein if Landlord shall
by contractual endorsement insure the obligations assumed/by Landlord under
Article 12 (B) hereof.  For each year of the term of this lease in which Landlord

-7-        The next page is Page 7A.

performs the common areas maintenance, Tenant shall pay to Landlord, Tenant's
share of the common areas maintenance cost upon being billed therefor from
time to time (but not more frequently than monthly) by Landlord.  As used herein,
the phrase "Tenant's share of the common areas maintenance cost" for any period,
shall be the product of the common areas maintenance cost for such period, and
the fraction the numerator of which is the number of square feet of floor area
within the demised premises, and the denominator of which is the number of
square feet of floor area within all buildings within the Shopping Center.
(Floor area shall be counted as provided in Section (B) of this Article.)
If floor area shall change during any year, a proper adjustment shall be
made.  Landlord agrees that, upon the request by Tenant, Landlord shall
furnish Tenant with copies of invoices with respect to items claimed to be

(More ends this page.)

-7A-        The next page is Page 8.

part of the common areas maintenance cost and shall permit Tenant or its designees to examine Landlord's book of account with respect thereto at reasonable times during normal business hours.

(J) Tenant agrees that the demised premises will be opened for business as a department store or discount department store under the "Caldor" tradename within a reasonable time after the date hereof and that thereafter during the three years next following such opening, except for periods during which the demised premises shall be closed on account of the happening of a fire, other casualty, taking by eminent domain or an event of the type described in Article 20 hereof, the demised premises will be kept open for business as a department store or discount department store under the "Caldor" tradename during the regular business hours of the Shopping Center. Tenant agrees that if at any time after the expiration of said three-year period it shall (subject to the provisions of Sections (P) and (Q) of this Article) elect to operate more than 25% of the sales area of the demised premises as other than a department store or discount department store or if it shall at any time after the expiration of said three-year period elect to close the demised premises for business (except for periods during which the demised premises shall be closed on account of the happening of a fire, other casualty, taking by right of eminent domain or an event of the type described in Article 20 hereof), Tenant shall give Landlord written notice of such election at least one hundred twenty (120) days prior to the date of such change in operations or closing of the demised premises as the case may be. Landlord shall have the right, at its election, exercisable by giving written notice to Tenant within said one hundred twenty (120) day period in case said notice from Tenant shall be a notice of change in operations, or at any time after the giving of such notice but prior to the re-opening of the demised premises for business as a department store or discount department store in case said notice from Tenant shall be a notice of the closing of the demised premises, to terminate this lease. In the event of the exercise by Landlord of either such election, the termination shall be effective upon the expiration of said one hundred twenty (120) day period in case said notice from Tenant shall be a notice of change; and in case said notice from Tenant shall be a notice of closing, the termination shall be effective upon the thirtieth (30th) day after the exercise by Landlord of such election. Rent and other charges hereunder shall be apportioned and adjusted as of the time of the termination. Notwithstanding the foregoing provisions of this Section (J), if said notice from Tenant shall be a notice of change and if Landlord shall exercise such election to terminate this

lease, then if Tenant shall, within fifteen (15) days of the giving of such notice of termination by Landlord, give to Landlord notice that Tenant has elected not to change such use of the demised premises, such notice of termination shall become void and of no force and effect; provided, however, that Tenant shall have the aforesaid right to elect not to change such use only once. In any event, Tenant agrees that no proposed change of use of the demised premises shall be for any purpose other than a lawful retail purpose which is not in direct competition with any then existing use in the Shopping Center and does not violate the provisions of any then existing instruments affecting the use which may be made of the demised premises. Landlord agrees to furnish Tenant with copies of all such provisions from time to time within thirty days after receiving a written request therefor from Tenant. Notwithstanding anything to the contrary contained in this lease, any pharmacy affiliated with Tenant may be operated in the demised premises under a name other than Tenant's trade name, it being understood that Massachusetts Law may prohibit or restrict the use of Tenant's trade name for any pharmacy affiliated with Tenant.

(K) Landlord agrees that there is a pylon sign ("the Pylon Sign") in the Shopping Center. The Pylon Sign shall be maintained in good repair by party then performing the common areas maintenance, the / and the cost of such maintenance and the cost of lighting the same shall be added to the common areas maintenance cost. The prior occupant of the demised premises had an attraction panel on the Pylon Sign. Landlord makes no representations whatsoever concerning said attraction panel or the right of Tenant to use the same, but Landlord hereby verifies that Landlord has no objection to the erection by Tenant of an identification panel thereon at Tenant's sole risk and expense; provided that Tenant shall thereafter keep said attraction panel in good attractive condition and shall pay the cost of lighting the same.

(L) Landlord agrees with Tenant to use reasonable efforts to keep a supermarket in operation in the Shopping Center at all times during the term of this lease, but should Landlord be unable to do so, Tenant shall have no right to terminate this lease, cease paying all or any part of the rent payable hereunder, or seek any damages from Landlord by reason thereof. Nothing herein contained shall be deemed to require Landlord to terminate the lease of any supermarket operator who shall close its premises in the Shopping Center for business.

addition   3.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

mises ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Tenant

-9-

hereby acknowledges that it has inspected the demised premises, that it is
fully satisfied with the physical condition thereof, that Landlord has made
no representations or promises to Tenant concerning the condition of the demised
premises, and that it accepts the same "as is". Landlord agrees to contribute
the sum of $20,000.00  towards any repairs that Tenant desires to make to
the roof or HVAC system in the demised premises. Such sum shall be paid within
ten days after the commencement of the term of this lease.

4.  (A)  The original term of this lease shall commence when Landlord
delivers possession of the demised premises to Tenant pursuant to the provisions
of Section (B) of Article 5 hereof, and shall expire upon the January 31st next
following the twenty-fifth (25th) anniversary of the rent day (hereinafter
defined). It is expressly understood and agreed that notwithstanding anything
contained to the contrary in this lease, Tenant shall not be responsible for
any payments on account of real estate taxes pursuant to the provisions of
Article 6 hereof or for any common areas maintenance obligations hereunder
prior to the rent day. All other obligations of Tenant provided for in this
lease, other than the payment of minimum rent pursuant to Article 5 hereof,
shall be effective from the commencement of the term of this lease. By way
of example, and not by way of limitation, from and after the commencement
of the term of this lease, Tenant shall be responsible for paying all utilities
used by the demised premises, including heat, for carrying fire insurance, as
provided in Article 10 (B), for carrying public liability insurance on the
demised premises, as provided in Article 12 (G), etc.

(B)  Tenant shall have the right, at its election, to
extend the original term of this lease for an additional period
of five (5) years commencing upon the expiration of the original
term provided that Tenant shall give Landlord notice of the exer-
cise of its election at least twelve (12) months prior to the expira-
tion of the original term. Tenant shall have the right, at its
election, to extend the original term as previously extended for
four (4) additional period of five (5) years each, each com-
mencing upon the expiration of the original term as previously
extended provided that Tenant shall give Landlord notice of the

-10-

exercise of its election at least twelve (12) months prior to the
expiration of the original term as previously extended. The
expression "the original term" means the period of twenty-five and a fraction
years referred to in Section (A) of this Article. Prior to the
exercise by Tenant of any of said elections to extend the original
term, the expression "the term of this lease" or any equivalent
expression shall mean the original term; after the exercise by
Tenant of any of the aforesaid elections, the expression "the
term of this lease" or any equivalent expression shall mean the
original term as it may have been then extended. Except as ex-
pressly otherwise provided in this lease, all the agreements and
conditions in this lease contained shall apply to the additional
period or periods to which the original term shall be extended
as aforesaid. If Tenant shall give notice of the exercise of an
election in the manner and within the time provided aforesaid,
the term shall be extended upon the giving of the notice without
the requirement of any action on the part of Landlord. Notwith-
standing the foregoing provisions of this Section (B), if at the
time of the exercise of any of the aforesaid elections to extend
the original term of this lease or at the time of the commencement
of any of the aforesaid extension periods Tenant shall be in default
of any of its obligations or agreements in this lease contained
beyond any period herein provided for the curing of such default,
then if Landlord shall so elect, the exercise of such election by
Tenant shall be deemed null and void or the extension period shall
not commence, as the case may be, and the term of this lease
shall expire upon the date herein provided for such expiration
absent the exercise of such election by Tenant.

HERE ENDS PAGE

-11-

(C)  Intentionally Omitted.

(D)  Upon the written request of Tenant, Landlord and Tenant will execute an instrument, recordable in form, setting forth the term and commencement date and such other information as may be necessary to constitute a "short form lease." Landlord and Tenant will share equally the cost of recording said short form lease.

(E)  Landlord agrees that the demised premises, and all rights of Tenant hereunder, are free and clear of all restrictions and encumbrances except as set forth in Section (B) of Article 2 hereof and except as specified in Exhibit C attached to this lease and that the use of the Shopping Center for retail stores and parking areas in connection therewith is in full compliance with all laws, ordinances and regulations of public authorities having jurisdiction (including, without limitation, zoning and building codes) and does not violate the rights of any third parties.

(F)  Whenever in this lease provision is made that either party shall have the right to terminate this lease, then, unless in said provision it is expressly provided otherwise, neither party hereto shall thereafter have any claim against the other under this lease or on account of the termination thereof.

:DRM
T

Commencing upon the rent day and thereafter
5.  (A)  /During the term of this lease Tenant agrees to pay to Landlord a minimum rent at the annual rate set forth in Section (C) of this Article, in each case ~~and with respect to the renewal terms~~ in monthly installments of one-twelfth (1/12th) thereof payable in advance upon the first day of each calendar month included within the term of this lease. Rent for any fraction which the rent day shall occur and/or at the of a month during termination of the term of this lease shall be prorated. All

*If either date are set forth in clause (a) or (b) shall occur subsequent to March 1, 1978, then the date "September 15, 1978" appearing below shall be extended by the number of days between the date on which the last of clauses (a) or (b) shall have occurred and March 1, 1978.

rent and other payments to be made by Tenant to Landlord shall be made payable to Landlord and/~~to~~ ~~Lessor~~ and sent to Landlord at the place to which notices to Landlord are required to be sent unless Landlord shall direct otherwise by notice to Tenant.

(B)  Notwithstanding anything in this lease to the contrary, rent shall commence to accrue upon "the rent day" which shall be the last to occur of the one hundred twentieth (120th) day after (a) "the Permit Date" (hereinbelow defined), or (b) the date on which the demised
6/13/78
premises shall be delivered to Tenant by Landlord, free of any occupants and any rights of other occupants.  Notwithstanding the foregoing, if the demised premises shall be opened for business with the public prior to the rent day, then the rent day shall be the date upon which the demised premises shall be so opened for business.  As used herein "the Permit Date" is the date upon which a building permit shall be issued to Tenant by the City of Boston for the work described in Section (E) of Article 9 of this lease.  Further, if the rent day shall occur between November 1st and February 28th, then the rent day shall be deemed to be March 1st, unless Tenant shall open for business with the public, in which event the rent day shall be the date upon which the demised premises shall be so opened for business.  The aforesaid one hundred twenty (120) day period shall be subject to extension by reason of delays in the completion of said work caused by events of the sort described in Article 20 of this lease (except for any fire or other casualty for which Tenant would be reimbursed for rent it pays by a so-called "use and occupancy" endorsement to the insurance described in Section (C) of Article 10 hereof), but only so long as such events are not due to the willful act or negligence of Tenant or its agents or contractors.  In addition, any delay caused by compliance with the City of Boston requirements in connection with building over the ten-foot drain easement presently existing in front of the demised premises shall also extend the aforesaid one hundred twenty (120)
two
day period.  Except as provided in the/immediately preceding sentences, Article 20 of this lease shall not apply to said one hundred twenty (120) day period.  It is expressly understood and agreed, however, that if the rent day shall not have occurred for any reason whatsoever on or before September 15, 1978    , Landlord may, at its election, terminate this lease by giving Tenant notice of such termination,  such termination to be effective upon the twentieth (20th) day after Landlord shall give such notice of termination to Tenant.  If Tenant shall, within ten days after the date of Landlord's notice of termination, give Landlord notice that the rent day shall be September 15, 1978, however, then (a) the rent day shall be September 15, 1978, (b) Landlord's

notice of termination shall become null and void and of no force or effect, and (c) this lease shall remain in full force and effect.

(C) The annual minimum rent payable during the original term of this lease shall be equal to Two Hundred Twenty-Five Thousand Dollars ($225,000.0) per year. During each additional five-year period to which the original term of this lease may be extended by Tenant as aforesaid, the annual minimum rent shall be equal to one-fifth of the total minimum rent and percentage rent payable hereunder for the sixty months immediately preceding the commencement of the additional period in question, without taking into account any rent abatement received by Tenant during said sixty-month period. Notwithstanding anything to the contrary contained in this lease, however, if the annual minimum rent payable as aforesaid for any such additional period shall be less than "the Index Rent" (hereinafter defined) for said additional period, Landlord may terminate this lease. If Landlord shall wish so to terminate this lease, Landlord shall do so by giving Tenant notice of such termination within thirty days after Landlord shall have available to it all of the statements and figures necessary so that it may so determine that it has the right so to terminate this lease; and such termination shall be effective as of the thirtieth day after Landlord shall give such notice to Tenant. It is expressly understood and agreed, however, that if Tenant shall give Landlord notice (within ten days after Tenant's receipt of such notice of termination) that the annual minimum rent payable for the additional period in question shall be equal to the Index Rent, then: (a) Landlord's notice of termination shall be rendered null and void and of no force or effect, (b) this lease shall continue in full force and effect, and (c) the annual minimum rent payable for the additional period in question shall be equal to the Index Rent.

(D) As used herein, the expression "the Index Rent" shall be equal to Two Hundred Twenty-Five Thousand Dollars ($225,000.00) increased in order to reflect fifty percent (50%) of the increase (if any) in "the Index" from the last reported figure thereof during 1977 until the figure reported immediately before the start of the additional period in question. As used

-13A-    Next page is Page 14.

herein, "the Index" is the "Consumers Price Index for Urban Wage Earners and Clerical Workers", as published by the United States Bureau of Labor Statistics. (In the event that the Index is not then in existence, the parties shall use such equivalent Price Index as is published by any successor governmental agency or such non-governmental agency as may then be publishing such an equivalent Price Index, in either case, such Price Index to be adjusted to the Index. If the basis upon which the Index is computed shall change, then a proper adjustment shall be made so that the results obtained shall be (as nearly as is possible) equivalent to those which would have been obtained had said basis not been changed). If the parties shall be unable to agree upon the dollar amount of the annual minimum rent, or upon any other matter dependent upon the Index, they shall promptly resolve such dispute by arbitration. Until the dollar amount of the annual minimum rent for an additional period shall be determined, Tenant shall pay minimum rent at the rate provided for during the immediately preceding period, and when the rent is so determined, Tenant shall pay Landlord immediately any excess rent due for the portion of such additional period which may theretofore have expired.

6. (A) Tenant shall pay to Landlord upon demand as additional rent the real estate taxes upon the demised premises for each tax year during the term hereof. Real estate taxes upon the demised premises for any tax year shall be the sum of (a) the real estate taxes upon the building upon the demised premises for said tax year and (b) the product of (i) the real estate taxes upon the land of the Shopping Center for said tax year and (ii) a fraction the numerator of which shall be the number of square feet of floor area in the demised premises, and the denominator of which shall be the number of square feet of floor area in all the buildings of the Shopping Center.

The real estate taxes upon the building upon the demised premises for any tax year shall be deemed to be the product of (x) the real estate taxes upon the building of which the demised premises are a part (the "Building") for said tax year, and (y) a fraction (Tenant's share), the numerator of which shall be the product of Tenant's portion (hereinafter defined) and the current assessment on the Building, and the denominator of which shall be the current assessment on the Building. Tenant's portion shall be equal to a fraction the numerator of which is the number of square feet of floor area within the demised premises (excluding the floor area of the addition), and the denominator of which shall be the number of square feet within the Building (excluding the floor area of the addition). Floor area shall be counted as provided in the last sentence of this section. For the tax year in which the addition shall be fully assessed, Tenant's share for such tax year shall be changed so that the difference between the fully assessed assessment on the Building and the current assessment on the Building shall be added to both the numerator and the denominator of Tenant's share. Also, if in any tax year prior to such full assessment of the addition, the assessment shall be based upon in-process construction of the addition, then for such tax year only Tenant's share shall be changed so that the difference between the in-process assessment on the Building and the current assessment on the Building shall be added to both the numerator and denominator of Tenant's share. (By way of illustration only, and not as a representation as to the present or future real estate taxes upon the demised premises or the size of the Building, assume for example

[*] and for each tax year thereafter

-14-    Next Page is Page 14A.

AL
TAYE
XES

that in the tax year 1978 (commencing July 1, 1977 and ending June 30, 1978), the current assessment on the Building is $600,000.00, and assume further that the demised premises occupies 60,000 square feet and the Building occupies 100,000 square feet, then Tenant's share shall be:

$$\frac{60,000 \times 600,000.00}{100,000} \quad \text{or} \quad \frac{3}{5}$$

If in the subsequent tax year, the assessment is increased by the amount of $100,000.00, which shall not be the final assessment, since the same is based upon work in process, then Tenant's share for such tax year shall be:

$$\frac{60,000 \times 600,000 + 100,000}{100,000} \quad \text{or} \quad \frac{23}{35}$$
$$\frac{}{600,000 + 100,000}$$

If in the following year, the assessment is further increased by another $100,000.00 which assessment is the assessment based upon completed construction of the addition, then Tenant's share for such tax year and each tax year thereafter shall be:

$$\frac{60,000 \times 600,000 + 200,000}{100,000} \quad \text{or} \quad \frac{?}{10}$$
$$\frac{}{600,000 + 200,000}$$

It is understood that if at any time the assessment on the Building shall be increased by work done to the portion of the Building not within the demised premises, then the entire portion of such increase shall be put into the denominator, but no portion shall be put into the numerator of the fraction making up Tenant's share. If at any time subsequent to the full assessment on the addition, the assessment on the Building shall be increased by work done to the demised premises, then the entire portion of such increase shall be added to both the numerator and the denominator of the fraction making up Tenant's share. If the Building shall not be separately assessed (and the Building shall be deemed to be separately assessed if the same is separately assessed according to the real estate tax bill, the assessors' records or written assessors' certification), then real estate taxes upon the Building for such tax year shall be deemed to be an amount which shall be in the same proportion to the real estate taxes upon the buildings of the Shopping Center jointly assessed with the Building as the floor area in the Building bears to the floor area in all the buildings of the Shopping Center which are jointly assessed with the Building. For the tax years during which the rent day shall occur and during which the term of this lease shall terminate, Tenant shall pay a pro rata portion of the real estate taxes upon the demised premises. If all or any part of the land of the Shopping Center shall not be separately assessed, each square foot of paved area shall be deemed equal to each other square foot of paved area jointly assessed. If there shall be more than one taxing authority, the real estate taxes for any period shall be the sum of the real estate taxes for said period attributable to each taxing authority. If the number of square feet of floor area of any building shall change during any tax year, the condition existing upon the day as of which real estate taxes are assessed for said tax year shall control. If real estate taxes shall be payable in installments, the amount payable hereunder by Tenant shall be payable in similar installments. (For the purpose of this Section, floor area of mezzanines to the extent used for offices or storage incidental to ground floor retail operations shall not be counted; other mezzanine floor area, basement floor area and upper story floor area shall be counted at half actual area.)

If there shall be a general revaluation of property within the City of Boston between the time that this lease is executed and the tax year in which the addition shall be fully assessed, then an appropriate adjustment shall be made in the foregoing computations to reflect the intent of the parties as set forth above. If the parties shall be unable to agree on such computations because of the revaluation, then the matter shall be settled by arbitration as provided in Article 30.

(B) The real estate taxes upon the Shopping Center for any tax year shall mean such amounts as shall be finally determined to be the real estate taxes payable with respect to the tax year; that is, the real estate taxes assessed against the Shopping Center for said tax year less any abatements, refunds or rebates made thereof. For the purpose of determining payments due from Tenant to Landlord in accordance with

the provisions of this Article 6: (i) the real estate taxes upon the Shopping Center for any tax year shall be deemed to be the real estate taxes assessed for said year until such time as an abatement, refund or rebate shall be made thereof; and (ii) if any abatement, refund or rebate shall be made for any tax year, an appropriate adjustment shall be made in the amount paid by Tenant to Landlord on account of real estate taxes. If the holder of a mortgage upon premises which include the demised premises shall require periodic real estate tax deposits in advance of the due date, Tenant agrees to deposit with Landlord similar periodic real estate tax deposits with respect to the real estate taxes upon the demised premises, a final adjustment to be made upon the determination of the amount of the real estate taxes upon the demised premises for the tax year in question.

(C) Tenant shall pay all taxes upon its signs and other property in or upon the demised premises. For the purpose of this Article such taxes shall not be included within real estate taxes upon the Shopping Center. If upon the assessment-day for real estate taxes for any tax year any construction shall be incomplete, an appropriate adjustment shall be made to carry out the intent of the parties. The expression "real estate taxes" shall include betterments assessments, so-called rent taxes and other governmental charges which may be charged, assessed or imposed upon the Shopping Center, except only that (i) if any betterments assessment is payable in installments, the real estate taxes for any tax year shall include only such installments of such betterments assessment as is allocable to said tax year, and (ii) if for any tax year included within the term of this lease a betterments assessment is assessed on the Shopping Center for an improvement (such as a street or sewer)-made prior to rent day, such assessment shall not be included within the real estate taxes upon the demised premises for any tax year. If Landlord shall have the right to elect the period over which any betterments assessment is payable, Landlord agrees to elect the longest period of time available.

HERE ENDS THIS PAGE.

centage
t

7. (A) In addition to the minimum rent payable under Article 5 hereof, the Tenant shall pay, for each "Percentage Lease Year" during the term of this lease, a percentage rent equal to two percent (2%) of the total of all Gross Sales (as hereinafter defined) made by the Tenant, any sublessee, assignee or concessionaire of Tenant, in, on or from the demised premises during any Percentage Lease Year ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ in excess of $14,000,000.00. The term "Percentage Lease Year" as used herein shall mean the twelve (12) month period ending on the last Saturday of January. The first Percentage Lease Year, however, would cover the period commencing on the day the term of this lease commences and ending on the last Saturday in January, 1980. If any Percentage Lease Year shall contain more than or fewer than twelve months, then said amount of $14,000,000.00 shall be adjusted for said Percentage Lease Year. In the event of a Percentage Lease Year of more than twelve months at the commencement of the term, such adjustment shall be made by increasing said amount by a sum equal to the product of said amount and a fraction. The numerator of said fraction shall be the actual amount of Gross Sales made during the portion of the twelve months immediately preceding the end of said Percentage Lease Year which corresponds to the months between the commencement of the term of this lease and the last Saturday in January of 1979. The denominator of said fraction shall be the total amount of Gross Sales made during the last twelve months of said Percentage Lease Year. If the Percentage Lease Year at the termination of the term shall contain fewer than twelve months, such adjustment shall be made in a manner similar to that described in the immediately preceding three sentences, but it shall be based upon the corresponding Gross Sales figures for the immediately preceding Percentage Lease Year. If the minimum rent payable pursuant to this lease for any Percentage Lease Year shall be greater than or less than $225,000.00, then for such Percentage Lease Year, said amount of $14,000,000.00 shall be increased or decreased (as the case may be) in proportion to such increase or decrease in the minimum rent payable for such Percentage Lease Year.

(B) The term "Gross Sales" as used herein shall mean the total gross amount received from all sales of merchandise or charges for rendering of services by whosoever rendered, whether for cash or on credit, made, furnished or rendered within or from the demised premises, provided, however, that notwithstanding anything hereinabove contained to the contrary, the following shall be deducted from "Gross Sales":

(a) the amount of refunds and credits to customers for merchandise returned or exchanged, provided that the original sales of same were included in "Gross Sales";

(b) sales at discount to non-profit, religious or charitable organizations; provided that separate records are kept of such sales;

(c) federal, state and local taxes paid by Tenant upon the receipts from or sale of merchandise or based upon the sales price thereof; provided such taxes are originally included in "Gross Sales";

(d) all receipts from cigarette, food and drink vending machines, ~~~~~~~~~~~~~~~~~ weighing machines, stamp machines and public telephones except such portion as may be retained by or received by Tenant as commissions;

(e) transfers of merchandise to other stores of Tenant, Tenant's subsidiaries or affiliates; provided that the original sales of same were included in "Gross Sales";

(f) sales at a discount to employees of Tenant or Tenant's subsidiaries or affiliates; provided separate records are kept of such sales;

(g) non-retail sales, bulk sales, and other non-recurring transactions not in the ordinary course of business;

(h) the portion of any sales price or charge which is added to the regular cash price to pay for installment or other credit financing;

-15-

(i) all sales of travel, money orders, theatre tickets, insurance policies, and similar services, except to the extent of commissions received by Tenant for such services; and

(j) the amounts charged to customers for mailing, delivery, alterations, installations, repairs, monogramming, storage, or other services rendered to customers at cost or approximately at cost in connection with the sale of merchandise.

(C) Tenant shall keep accurate books and records ~~~~~~~~~~~~~~~~~ showing the amount of Gross Sales in or from the demised premises for each Percentage Lease Year. Such records shall be produced and made available for inspection at reasonable times by Landlord or its duly authorized representatives at Tenant's principle accounting office upon not less than ten (10) days' written advance notice to Tenant by Landlord for the purpose of verifying any annual statement of Gross Sales. If any such inspection shall reveal a deficiency in any payment of percentage rent, Tenant shall forthwith pay to Landlord the amount of the deficiency. If the Gross Sales for any Percentage Year shall be understated by more than three percent (3%), Tenant shall pay to Landlord, in addition to all other payments, the cost of Landlord's performing such inspection.

(D) Tenant shall submit to Landlord on or before the ninetieth (90th) day following the end of each Percentage Lease Year of the term hereof a statement, certified to be true and correct by a corporate officer of Tenant, showing the Gross Sales made by it and those claiming under it in, on or from the demised premises during such Percentage Lease Year and Tenant shall pay any percentage rent due to Landlord together with such statement. Tenant shall also submit to Landlord on or before the thirtieth day following the end of each month included within said lease year such statement as to be known, then until such time as the real estate taxes for such month shall be known, the real estate taxes for such month shall be determined to be an amount equal to the real estate taxes for the last month during said lease year for which the real estate taxes shall be known. When the real estate taxes shall be known, the real estate taxes for said lease year shall be recomputed and an appropriate adjustment shall be made. The figure set forth in clause (i) above shall be increased during each year of the extended term in the manner set forth in Article 5 (D). MUST BE 98,398 ?

(F) Any amount payable by Tenant on account of common area maintenance for/ attributable to the floor area of the addition to the demised premises may be deducted from the amount of percentage rent payable by Tenant pursuant to the provisions of this Article, on a non-cumulative basis, for said year.

REPAIRS    B. (A) Tenant agrees that it will make all repairs and alterations to the property which Tenant is required to maintain as hereinafter set forth, which may be necessary to maintain the same in as good repair and condition as the same are in at the or in as good repair and condition as they may thereafter be put in by Tenant, rent day, or which may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, reasonable wear and tear, and damage by the

-15A-    The next page is Page 16.

(B) Any repairs required to utility conduits located in the
demised premises and not serving the demised premises exclusively, and any
repairs required to the utility conduits located outside the demised premises,
and serving the demised premises, shall be made by the party then performing
the common areas maintenance, and the cost thereof shall be added to the
common areas maintenance cost; except, however, if any such repairs shall
be required as the result of the fault of either party, then the cost of
such repairs shall be paid for by such party.

(D) Landlord agrees that as of the rent day the de-
mised premises shall be connected to the electric lines
and gas lines (if there be gas lines and if the utility operating
the same shall permit the demised premises to be connected thereto
serving the municipality wherein the demised premises are located
and to the water and sewer system of said municipality. Although
the/cost of connecting such utilities to the demised premises shall
be borne by Landlord, the charge for the amounts thereof consumed
shall be borne by Tenant. Municipal charges for sewerage disposal
based upon water consumption shall be borne by Tenant; other muni-
cipal charges for sewerage disposal shall be considered part of
the real estate taxes.

*initial*

HERE ENDS THIS PAGE.

*within the Shopping Center but*

-18-

ALTERATIONS        9. (A) Tenant agrees not to make any structural repairs,
alterations, other improvements or installations to or upon the
demised premises without on each occasion obtaining the prior
written consent of Landlord, which consent Landlord agrees not
unreasonably to delay or withhold. Tenant agrees that any repai
alterations, other improvements or installations made by it, stru
tural or nonstructural, shall be done in a good and workmanlike
manner and in conformity with all laws, ordinances and regulati
of all public authorities having jurisdiction, that materials
good quality shall be employed therein and that the structure
the demised premises will not be endangered or impaired thereb
All salvage in connection therewith may be disposed of by Tenan
It is agreed and understood that Landlord shall accept the de-
mised premises as altered pursuant to the provisions hereof
without any obligation upon Tenant to restore the same to their
former condition, except, however, that Landlord shall have the right, at
its election, exercisable at the expiration or sooner termination of the term
hereof to cause Tenant at its sole cost and expense to remove any or all such
alterations, improvements or installations made by Tenant or anyone claiming
under Tenant to the demised premises without the written consent of Landlord
and to restore the demised premises to their former condition.

(B) All repairs, alterations, other improvements or
installations made to or upon the demised premises which are so
attached to the realty that the same will be by law deemed to
be a part of the realty shall (subject, however, to the provi-
sions of Section (A) of this Article and the provisions of the
following sentence) be the property of Landlord and remain upon
and be surrendered with the demised premises as a part thereof
upon the termination of the term of this lease. Notwithstandin

-19-

the foregoing, all trade fixtures, lighting fixtures, air-conditioning equipment (other than ducts) and signs, whether by law deemed to be a part of the realty or not, installed at any

fixtures
(air-
condi-
tioning
equipment
installed

time or times by Tenant or anyone claiming under Tenant at its (other than/any addition to the demised premises) sole cost and expense/shall remain the property of Tenant or persons claiming under Tenant and may be removed by Tenant or anyone claiming under Tenant at any time or times during the term of this lease or any occupancy by Tenant thereafter, the Tenant agreeing to repair any and all damage to the demised premises occasioned by the removal by Tenant or anyone claiming under Tenant of any property from the demised premises. Notwithstanding the foregoing provisions, Tenant shall not have the right to remove any fixture or equipment originally installed in the demised fixture or equipment premises by Landlord at its sole expense or any replacements for any such/

(C) Landlord agrees that, if any institutional or other independent lender normally engaged in fixtures and equipment financing, to which Tenant trade trade shall grant a security interest in the/fixtures and/equipment installed by Tenant at its sole cost and expense in the demised premises, shall request that Landlord waive any lien which Landlord may have thereupon by operation of law for the performance of any obligations of Tenant hereunder, Landlord shall execute the same; provided the same does not impose any obligation upon, or release any right (except such lien) of, Landlord; and provided that the same shall require that said lender shall repair any damage done to the demised premises in the removal of such/

(D) Tenant agrees that it will procure all necessary permits before making any repairs, alterations, other improvements or installations. Landlord agrees it will cooperate, without expense, with Tenant in obtaining such permits. Tenant agrees to pay promptly when due the entire cost of any work done by Tenant upon the demised premises so that the demised premises shall at all times be free of liens for labor or materials. If any such lien shall be filed, Tenant will either pay the same or procure the discharge thereof by giving security or in such other manner as may be required or permitted by law. Tenant agrees to save and indemnify Landlord from any and all injury, loss, claims or damage to any person or property occasioned by or arising out of the doing of any such work.

/fixtures and equipment from the demised premises by such lender or anyone claiming under it.                    Next page is Page 20A.

(E) Tenant shall apply for all building and other permits as shall be required in order to modernize and enlarge the demised premises in accordance with the plans and specifications referred to in Exhibit B attached hereto and made a part hereof. Such application shall be made as soon as possible after the execution of this lease. Tenant agrees, at Tenant's sole cost and expense, to commence such modernization and enlargement promptly upon the issuance of such permits and to prosecute the same to completion in accordance with said plans and specifications, with due diligence. Said work shall be done by Tenant so as not unreasonably to interfere with the operation of the business of any other occupant of premises in the Shopping Center, and in compliance with the foregoing provisions of this Article 9. Upon the commencement of the construction thereof, the addition to the demised premises so to be erected by Tenant shall be deemed to be part of the demised premises for all purposes it being understood of this lease, ~~and~~/that Tenant shall make all repairs and alterations to said addition, structural and non-structural, interior and exterior, which may be necessary to maintain the same in first-class repair and condition, reasonable wear and tear, and damage by the casualties and events described in Section (D) of Article 10 and Article 11 of this lease excepted. The addition shall be in the location designated on the lease plan as "Addition".

HERE ENDS THIS PAGE.

-20A-