UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-12249-DPW

| | | |
|---|---|---|
| HARVARD REAL ESTATE–ALLSTON, INC.,<br>Plaintiff,<br><br>v.<br><br>KMART CORPORATION, KMART STORE 9424,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | PLAINTIFF'S REPLY BRIEF<br>IN SUPPORT OF MOTION TO<br>REMAND |

Kmart's Opposition fails to establish the removal jurisdiction of this Court, based upon either diversity under 28 U.S.C. §1332 or federal question under 28 U.S.C. § 1331, for all of the following reasons:

(1)    Kmart fails to recognize, throughout its Opposition, that it bears the burden of establishing this Court's removal jurisdiction, instead citing inapplicable authority pertaining to the plaintiff's burden in its complaint;

(2)    Kmart cites inapplicable injunction cases in an attempt to establish amount in controversy diversity jurisdiction, failing to recognize that Harvard seeks not an equitable remedy but simply recovery of possession;

(3)    Kmart fails to recognize that as a tenant at sufferance following the expiration of the lease, it has no lease rights by which monetary damages can be measured.

(4)    Kmart erroneously assumes that only a federal court can interpret the federal Bankruptcy Code, even though Massachusetts state courts have not hesitated to rule on the effect of prior Bankruptcy Court orders, and even though in the pending Bankruptcy litigation the Bankruptcy judge clearly regarded the Massachusetts state court as an

adequate and appropriate forum to determine the effect of prior Bankruptcy Court orders.[1]

(5)    Massachusetts has an important interest in adjudicating summary process eviction cases, an area traditionally a state law matter; moreover, as federal courts have recognized, adjudication of such summary proceedings is inappropriate for the federal courts.

I.    **OTHER FEDERAL COURTS HAVE REMANDED SUMMARY PROCESS EVICTION CASES DUE TO THEIR UNIQUELY STATE-BASED CHARACTERISTICS, BECAUSE THE FEDERAL RULES ARE NOT APPROPRIATE FOR SUMMARY PROCESS.**

Summary process eviction cases are uniquely suited for adjudication in the state courts, not the federal courts, due to the fact that "summary process is a statutory device designed to achieve simple, expeditious and inexpensive resolution of disputes over the right to possession of real property." Glen 6 Associates, Inc. v. Dedaj, 770 F.Supp. 225, 226 (S.D. N.Y. 1991) ("Dedaj"). See 951 Plymouth Restaurants, Inc. v. Pemberton Pub, Inc. (In re Pemberton Pub, Inc.), 16 B.R. 275 (Bankr. D. Mass. 1981) (Lavien, J.) ("The matter of Landlord & Tenant law, the relationship and the manner in which leases are normally terminated . . . are [    ] matters normally and naturally handled by the state court.").

Other federal courts, recognizing these unique features of summary evictions, have remanded cases to the state court after tenants removed them to the federal court. In Dedaj, the defendant commercial tenants who leased two pizza stores in a shopping center ceased paying rent because the landlord allegedly failed to provide specific services under the lease. The

---

[1]    Since the date Harvard filed its Motion to Remand, Harvard has filed an Opposition to Kmart's Motion to Dismiss Without Prejudice, a copy of which is attached hereto and incorporated herein.

defendants removed the ensuing state court summary proceeding brought by the landlord to the

federal court on diversity grounds. The court remanded the case, holding that it lacked subject

matter jurisdiction over summary possession proceedings. The court explained why the removal

"tactic" could not succeed:

> "Even if diversity jurisdiction exists, removal is proper only if the court had
> original jurisdiction of the matter. Removal acts to the prejudice of state court
> jurisdiction and the privilege, therefore, is to be strictly construed . . . [Moreover]
> No authorization for summary adjudication of landlord/tenant disputes is provided
> in the federal rules of procedure nor in any other statute governing procedure in
> the district court . . . A summary process by its very nature is intended to escape
> some or most of these trial procedures and differs greatly from the plenary civil
> trials governed by the federal rules. It is obvious that a summary process and a
> plenary civil trial, shaped by the federal rules, are very different. In light of
> *Hanna v. Plumer* and progeny, unless there is express statutory authorization . . .
> or compelling reasons . . . a federal court cannot allow proceedings more summary
> than the full court trial at common law . . . "

Dedaj, 770 F.Supp. at 227-228.

Similarly, in United Mutual Houses, L.P. v. Andujar, 230 F.Supp.2d 349 (S.D.N.Y. 2002)

("Andujar") the federal district court granted the landlord's motion to remand on the ground that

no essential question of federal law existed to justify federal jurisdiction. In that case, the

landlord brought a summary holdover proceeding in the New York County Housing Court,

alleging the tenant's violation of various provisions of her lease, including having an

unauthorized occupant in the premises. The tenant removed the case on the ground that because

the landlord received federal tax credits resolution of the action turned on substantial questions of

federal law, including occupancy standards under federal law. The court held that "[w]here the

resolution of a federal law question is not essential to the plaintiff's right to relief, no removal

jurisdiction exists." Andujar, 230 F.Supp.2d at 353. As the court noted, "a plaintiff is master of

the complaint–neither a federal defense nor counterclaim will create removal jurisdiction." <u>Id</u>. at

350. The court further explained:

> "[A]bsent express authorization by statute, federal courts cannot entertain
> summary proceedings [citing <u>Glen 6 Associates</u>]. The Federal Rules of Civil
> Procedure provide no authorization for summary adjudication of landlord-tenant
> disputes, nor do any other statutes governing procedure in this district . . . 'I]t is
> well settled that the landlord-tenant relationship is fundamentally a matter of state
> law.' <u>Hearn v. Lin</u>, No. 01-CV-8208, 2002 WL 720829, at *4 (E.D.N.Y. Feb. 14,
> 2002). Time and again, district courts have disclaimed jurisdiction over landlord-
> tenant disputes and returned them to Housing Court [citations omitted]. "It is
> appropriate for a federal court to abstain in landlord-tenant actions, as they
> involve complex questions of state law that bear on important state policy issues."

<u>Andujar</u>, 230 F.Supp.2d at 354.

It is obvious that the same policy concerns expressed in these cases from the federal

district court in New York are equally applicable to Massachusetts' Summary Process statute,

M.G.L. c. 239, § 1 et. seq. and the Uniform Summary Process Rules. The Massachusetts

Summary Process statute is a comprehensive scheme regulating all of the various types of

eviction matters. Clearly, the legislature has created this statutory summary process scheme to

uniformly regulate summary process evictions such as the case at bar. Harvard strongly urges

this Court to accept the rationale of these cases, which express so well why Kmart's removal of

the instant summary process eviction action is inappropriate for the federal courts and therefore

should be remanded to the state court.

## II.    KMART FAILS TO RECOGNIZE THAT IT, NOT HARVARD, HAS THE BURDEN OF PROOF TO ESTABLISH SUBJECT MATTER REMOVAL JURISDICTION.

Conspicuously absent throughout Kmart's Opposition is any recognition of the crucial

point that as the removing defendant, Kmart, not Harvard, bears the burden to clearly establish

this Court's subject matter jurisdiction. Kmart further fails to acknowledge what the United

States Supreme Court and the First Circuit have repeatedly emphasized, that removal jurisdiction

is intended to be restrictive. In an opinion issued only three weeks ago, the First Circuit

reiterated these important points:

> "[I]t is well-settled that 'the plaintiff [is] the master of the claim; he or she may
> avoid federal jurisdiction by exclusive reliance on state law.' Caterpillar Inc. v.
> Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Thus, the
> burden to prove that a federal question has been pled lies with the party seeking
> removal. *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding
> Workers*, 132 F.3d 824, 831 (1st Cir. 1997). In light of this burden, and of the
> important federalism concerns at play in considering removal jurisdiction, *see,
> e.g., Franchise Tax Bd., 463 U.S. at 8,* we find that any ambiguity as to the
> source of law relied upon by the [plaintiffs] ought to be resolved against
> removal. *See Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108-09, 61
> S.Ct. 868, 85 L.Ed. 1214 (1941) (removal statute should be strictly construed
> against removal).

Rossell-Gonzalez v. Caleron-Serra, ____ F.3d ____, 2004 WL 2900370 * 6 (1st Cir. Dec. 15,

2004) (Copy attached hereto as Exhibit 1). Doubts regarding removal jurisdiction should be

resolved in favor of remand, and "a federal court should rigorously enforce the jurisdictional

limits that Congress chooses to set in diversity cases. Coventry Sewage Associates v. Dworkin

Realty Co., 71 F.3d 1, 4 (1st Cir. 1995). "Even if diversity jurisdiction exists, removal is proper

only if the court had original jurisdiction of the matter. Removal acts to the prejudice of state

court jurisdiction and the privilege, therefore, is to be strictly construed." Dedaj, 770 F.Supp.

at 227.[2]  Yet Kmart fails to address any of these important federalism considerations.

---

[2]  "A presumption in favor of remand is necessary because if a federal court reaches the
merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it
deprives a state court of its right under the Constitution to resolve controversies in its own
courts." University of South Alabama v. American Tobacco Co., 168 F.3d 405, 411 (11th Cir.
1999).

For removal purposes, "the court is to look only to *plaintiff's complaint*" to determine "whether the plaintiff's *claim to relief* rests upon a federal right." <u>Rossello-Gonzalez</u>, 2004 WL 2900370 at \*5, quoting <u>Hernandez-Agosto v. Romero-Barcelo</u>, 748 F.2d 1, 2 (1st Cir. 1984) (emphasis in quoted case). "The existence of a federal defense is not sufficient for removal jurisdiction." <u>Id</u>. *See* <u>Rivet v. Regions Bank of Louisiana</u>, 522 U.S. 470, 476, 118 S.Ct. 921, 925-926 (1998) (remanding case and rejecting defendant's contention that res judicata defense of prior order of Bankruptcy court created federal question jurisdiction).

In its failed attempt to establish diversity jurisdiction, Kmart cites certain injunction cases that are clearly inapplicable to the present summary process case in which Harvard seeks not an injunction but recovery of possession of the premises following the expiration of the commercial lease. (Kmart Opposition at 12-13). However, in all of the injunction cases cited by Kmart, the courts addressed a different issue than is presented here: whether *the plaintiff* in its complaint had met its minimal burden required to establish the amount in controversy. In none of Kmart's cited cases was the court presented, as it is here, with a removing defendant attempting to establish subject matter jurisdiction. The standards are completely different, yet Kmart ignores this crucial distinction.

With regard to federal question jurisdiction, Kmart erroneously insists that only this Court can interpret the Bankruptcy Code, even though Massachusetts courts have not hesitated to do so, and even though the Bankruptcy Court assumed that a Massachusetts state court would be perfectly capable of determining the alleged res judicata effect of the assumption order.

6

**III.    KMART'S OPPOSITION FAILS TO MEET ITS BURDEN TO CLEARLY
ESTABLISH FEDERAL DIVERSITY JURISDICTION.**

**A.    The Injunction cases cited by Kmart do not apply to this action for
recovery of possession; moreover, they do not address the defendant's
burden on removal to establish subject matter jurisdiction.**

In its failed attempt to establish the minimum amount in controversy for diversity

jurisdiction, Kmart in its Opposition cites several very old federal injunction cases from the

1940's and 1950's.   (Opposition at 12-13).   *Tellingly, however, none of these diversity*

*jurisdiction cases cited by Kmart involve removal of a case from state court as in the case at*

*bar.*   Rather, in each of these cases the Court determined whether the value of the rights at

stake exceeded the jurisdictional minimum only with reference to the Plaintiff's complaint.

Moreover, none of the First Circuit cases cited by Kmart stands for the proposition that

a removing defendant may establish amount in controversy jurisdiction based solely upon

prospective rents and other such costs as Kmart claims here.

In addition, Kmart erroneously states that Harvard is seeking equitable remedies

(Opposition at 2, 12), when in fact Harvard seeks a distinct remedy, namely recovery of

possession of the commercial premises.   In Massachusetts, summary process actions for

recovery of possession of a leasehold are distinguishable from injunctive actions, as actions for

possession must follow the strict summary process statutory scheme.   "It's clear that one must

use [summary process] to recover possession from persons let into possession as a tenant or in

the nature of a tenancy as a general rule unless there is an urgency or an alternative statutory

directive permitting a different avenue of relief."   G. Warshaw, <u>Massachusetts Landlord-Tenant</u>

7

Law, §7:4 at 253 (2000).[3]  Indeed, even though Kmart is only a tenant at sufferance since its

lease expired on January 31, 2004, Harvard could not have evicted Kmart by an injunctive

action.  To the contrary, under M.G.L. c. 239 Harvard is required to proceed under the

summary process statute.

Remarkably, none of the injunction cases cited by Kmart are removal cases.  Therefore,

Kmart's cited cases do not support its position because a much more rigorous showing is

required for the removing party to establish removal jurisdiction than is required for the

plaintiff to establish original jurisdiction in its complaint.  *See* Radlo v. Rhone-Poulenc, S.A.,

241 F.Supp.2d 61, 63 (D. Mass. 2002) (explaining the difference in the respective burdens of

proof and stating based upon all of these principles, the removing defendant should have the

burden of showing that there is *"legal certainty"* that the Plaintiff, if successful, will recover

more than the jurisdictional minimum) (Emphasis supplied).   All of the cases cited by Kmart

concern only whether *the plaintiff* had established the requisite amount in controversy.  Thus,

these cases involve the minimal showing required by the plaintiff in its original complaint and,

in any case, do not support its position with regard to removal subject matter jurisdiction.[4]

*None of these cases are removal cases*; therefore the more relaxed burden of proof applies to

---

[3]    *See* Attorney General v. Dime Savings Bank of New York, 413 Mass. 284, 596
N.E.2d 1013 (1992); Serreze v. YWCA of Western Massachusetts, Inc., 30 Mass. App. 639
(1991).  *See also* M.G.L. c. 139, § 19, which makes a distinction between summary process
actions and actions for injunctive relief.

[4]    Normally, "the sum claimed by the plaintiff controls if the claim is apparently made
in good faith."  Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001), *quoting* St. Paul
Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

the plaintiff's original complaint.[5]

While the standard used in the cases cited by Kmart is very deferential to the amount in controversy allegations in a plaintiff's complaint, the appropriate standard applied to a removing defendant such as Kmart is much more stringent.  *See* <u>Radlo</u>, 241 F.Supp. at 63. Therefore, on removal the issue is whether the defendant can show to a legal certainty that the successful Plaintiff will recover more than the jurisdictional minimum. Yet Kmart fails to even recognize that it must sustain this higher burden of proof.  Here, Harvard as the successful plaintiff will merely recover possession, and since Kmart is a tenant at sufferance by the expiration of the lease, it has no lease rights and therefore no basis for any claim that it would suffer damages by Harvard's recovery of possession.  (See Section B below).

Finally, injunction cases are inapplicable to this summary process action for recovery of possession, because in injunction cases the court must typically balance the equities by taking into account the monetary costs associated with preserving or altering the status quo.  *See, e.g.,* <u>Rosario-Urdaz v. Rivera-Hernandez</u>, 350 f.3d 219, 221-222 (1st Cir. 2003). Clearly, no such considerations apply in an eviction action for recovery of possession.

> **B.    Where the Lease has expired, Kmart is a tenant at sufferance and it has no leasehold rights by which any monetary damages or liabilities could be measured.**

Examining Kmart's bald assertion that the amount in controversy is "the value of the

---

[5]    For instance, the First Circuit in the 1949 case cited by Kmart, <u>Food Fair Stores, Inc. v. Food Fair, Inc.</u>, 177 F.2d 177, 182 (1st Cir. 1949), applied the relaxed burden of proof applicable *to a plaintiff's complaint*: the mere "adequate formal allegation of an amount in controversy" in the plaintiff's complaint is sufficient to confer diversity jurisdiction, unless it "appear[s] *to a legal certainty from the rest of the complaint that the claim is really for less than the jurisdictional amount.*" (Emphasis supplied) (citing <u>St. Paul Mercury Indemnity Co</u>. v. <u>Red Cab Co</u>., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed 845).

right to be protected", <u>Textron v. American Woolen Co.</u>, 122 F.Supp. 305, 308 (D. Mass 1954), where Harvard elected to declare null and void Kmart's purported election to extend the lease, so that the lease expired on January 31, 2004, Kmart is a tenant at sufferance.  As such, Kmart has no leasehold right to be protected as its rights ended when the lease expired.  Therefore, Kmart cannot use asserted annual rent amounts, or the difference between those amounts and an alleged fair market value, to establish jurisdiction.

Kmart tries to make much of the fact that the minimum annual "rent" under the expired lease is allegedly in excess of the $75,000.00 minimum necessary to establish diversity jurisdiction under 28 U.S.C. § 1332.  However, by doing so Kmart disregards the fact that where Harvard elected to declare as null and void Kmart's purported election to extend the lease term, the lease expired as of January 31, 2004.  Kmart remains in the premises not as a tenant but as a tenant at sufferance only.  This is an important distinction under the applicable Massachusetts landlord-tenant law.  "A tenant at sufferance is . . . a person who continues in possession of premises after the termination of a tenancy and thus remains at the sufferance of the landlord until such time as the landlord decides to evict the tenant."  G. Warshaw, <u>Massachusetts Landlord-Tenant Law</u>, §6:2 at 207.  *As a tenant at sufferance, Kmart does not have any rights under the lease.*  Therefore, payments made to the landlord by a tenant at sufferance, such as Kmart, are for their continued use and occupation of the premises, not as rent.[6]  For these reasons, Kmart's current payments for use and occupation only of the

---

[6]    Kmart's allegation (see Kmart Opposition at 13-14, and Stollenwerck Affidavit ¶ 9) that in August 2004 Harvard offered Kmart $4.5 million for Kmart's voluntary termination of the lease is immaterial to the value of the leasehold in this action because (1) the alleged offer pertained to settlement negotiations and cannot be used as evidence in this matter; (2) the alleged offer pertained to a host of prior lease violations by Kmart involving monetary claims which are

premises do not establish amounts in excess of the $75,000.00 minimum necessary to establish diversity jurisdiction under 28 U.S.C. § 1332.

Even assuming that the lease did not expire on January 31, 2004, but terminated after the Notice to Vacate/Notice of Termination was sent on April 23, 2004, the alleged cost to Kmart and/or benefit to Harvard is speculative, contingent, and collateral to the right of possession which is directly in issue here.  Clearly, in this case Harvard has not asked for any damages and seeks only possession of the premises.  In Dedaj, the landlord sought a judgment of $252,000.00 against the commercial tenant.  Yet the Southern District of New York noted that under the lease acceleration clause the payments were due monthly over the life of the lease, and if the plaintiff successfully mitigated its damages by re-leasing the property, the future payments might never have to be made, or might be made for a smaller amount. "Consequently, the claim for future damages is a contingent one that may never be realized and it is doubtful that the statutory amount in controversy exists at this time."  Dedaj, 770 F.Supp. at 227 n.1.  In any case, the Dedaj court based its remand decision on the fact that the federal courts were inherently an inappropriate forum for summary process cases.  (See Section I above).

The fact is that Kmart has failed to cite any cases in which the court determined that it had amount in controversy jurisdiction based upon the tenant's alleged liability for future rents. See Dickal 770 L.L.C. v. PRN Corp., 2002 WL 1285813 (N.D. Ill. 2002) (alleged value of future rents of more than $1,000,000.00 was not pertinent since "the method of determining the value of a lease must be consistent with . . . the fact that the primary remedy under [state law] is

not at issue in this action for possession only; and (3) the lease has expired.

the recovery of possession . . . [and] the purpose of the [state's eviction statute is] to provide

summary proceedings with a quick resolution on the issue of possession only . . . ") (Emphasis

supplied); Levet Properties Partnership, 2003 WL 21715010 ("[O]nly the value of the right

directly in issue in the particular suit, not the collateral effect of the judgment, may be

considered in making up the necessary jurisdictional amount."), citing Burks v. Texas Co., 211

F.2d 443, 445 (5th Cir. 1954); Rubel-Jones Agency, Inc v. Jones, 165 F.Supp. 652, 655 (W.D.

Mo. 1958) ("only the matter which is directly disputed is considered, and any contingent loss

which may be suffered by either of the parties through the probative effect of an adverse

judgment is not to be included.").

**B.     The alleged Common Area (CAM) Maintenance Charges are not claimed in this summary process action, are not directly related to this action for recovery of possession, and Kmart cannot be liable for such charges as a consequence of this summary process action.**

Kmart also seeks to establish the minimum amount in controversy based upon certain

three-year old Common Area Maintenance ("CAM") charges for which Kmart is liable in the

Bankruptcy action. (Kmart Opposition at 9-10 and O'Neill Affidavit ¶   ).  However, these

charges (1) have not been claimed in this summary process action; (2) are not directly related to

this action for recovery of possession; and (3) are not charges for which Kmart could be held

liable as a result of an adverse judgment in this summary process action.  In fact, this is a

complete red herring being dredged up by Kmart in a vain attempt to establish that it meets the

minimum amount in controversy.  Regardless of whether the present action is litigated in this

Court, or is remanded to the state court, the CAM charges do not have any role in this summary

process proceeding.  Rather they are charges being litigated in separate proceedings in the

Bankruptcy Court. Moreover, these charges appear to be CAM charges dating back as far as 2000 and 2001. Therefore, any CAM charges have absolutely nothing to do with the present summary process action. Therefore, the Court should accordingly disregard the CAM charges as irrelevant to determining whether Kmart has met its burden to establish removal jurisdiction.

## IV.    KMART FAILS TO SUSTAIN ITS BURDEN TO ESTABLISH FEDERAL QUESTION JURISDICTION, AND IT FAILS TO EVEN ADDRESS ITS BURDEN OF PROOF ON REMOVAL.

Kmart claims that because of prior Bankruptcy Court orders, the issues of the lease termination and its default "are exclusively federal Bankruptcy Code issues that should not be decided by a state court." (Kmart Opposition at 18). Throughout this section of its Opposition, Kmart's reasoning is totally confused and misleading.

First, Kmart misstates the period during which it defaulted under the Lease: "In its complaint, Harvard alleges that Kmart was in default under the Lease at the time that the Bankruptcy Court authorized Kmart to assume the Lease." (Kmart Opposition at 17). As alleged support for this statement, Kmart submits the Rahbany Declaration and the Bankruptcy Court's Assumption Order. (See Rahbany Declaration ¶11, Exhibit E). However, reference to the Bankruptcy Court's order attached to the Rahbany Declaration shows clearly that in fact the Bankruptcy Court's Assumption Order was effective "as of the *Effective Date* of Kmart's Joint Plan of Reorganization, *May 6, 2003* (the "Effective Date")". (Emphasis supplied). Yet Harvard's Notice of Default notified Kmart that it was in default of the Lease by selling groceries in the premises during a later period, as of September 5, 2003, i.e., during the post-confirmation period, *four (4) months later*. Clearly, post-assumption violations form the basis for the Notice of Default (and Harvard's subsequent election to void Kmart's purported

13

extension of the Lease), not defaults "at the time that the Bankruptcy Court authorized Kmart to assume the lease" as asserted by Kmart.

Second, Kmart wrongly implies that the burden of persuasion is on Harvard, not Kmart, to establish federal question removal jurisdiction: *"Harvard must necessarily still litigate* the effect under federal bankruptcy law of Kmart's assumption of the lease" (Opposition at 18) and *"Harvard must show* that the Bankruptcy Code has not rendered those allegations [grounds for eviction] moot." (Id.) (Emphasis supplied). Kmart completely ignores the fact that as the removing defendant, Kmart, not Harvard, has the burden of proof to establish federal question jurisdiction. *See* Rossell-Gonzalez, 2004 WL 2900360 ("the burden to provide that a federal question has been pled lies with the party seeking removal . . . any ambiguity as to the source of law relied upon by the [plaintiffs] ought to be resolved against removal."); Gattegno v. Sprint Corp., 297 F.Supp.2d 372, 375 (D. Mass. 2003) and Murphy v. Newell Operating Co., 245 F.Supp.2d 316, 318 (D. Mass. 2003), citing Danca v. Private Health Care Systems, Inc., 185 F.3d 1, 4 (1st Cir. 1999).

Third, the only case cited by Kmart to support its view that "matters of federal law are central to this dispute", San Juan Legal Services, Inc. v. Legal Services Corp., 655 F.2d 434 (1st Cir. 1981), does not in fact support Kmart. Once again, Kmart has cited a case where removal jurisdiction was not at issue, only jurisdiction with respect to the original complaint. The court in that case found that subject matter jurisdiction existed *with respect to the original complaint* because "[the federal law in question] is *the only element* of plaintiff's cause of action: the resolution of its claims depends upon the construction given that law . . . " San Juan Legal

Services, 655 F.2d at 437. Moreover, as the court in San Juan Legal Services pointed out (but Kmart neglects to mention): "*The federal law under which the claim arises must be a direct and essential element of plaintiff's cause of action.*" San Juan Legal Services, 655 F.2d at 437, citing Smith v. Grimm, 534 F.3d 1346, 1350 (9th Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). Totally unlike the facts in San Juan Legal Services, the res judicata defenses that Kmart has raised based upon prior Bankruptcy Court orders are far from being "the only element" or a "direct and essential element" of Harvard's state law eviction cause of action. Harvard's eviction case concerns Kmart's continued sale of groceries in the premises. Kmart's claims are clearly not a direct and essential element of Harvard's eviction case.

Kmart also attempts to insist that its claims and defenses based upon res judicata "are exclusively federal Bankruptcy Code issues that should not be decided by a state court." (Kmart Opposition at 18). This conveniently overlooks the facts that (1) Kmart itself chose to litigate these issues in the Bankruptcy Court in its adversary complaint, and (2) the Bankruptcy Court itself obviously thought that the Massachusetts state court was an appropriate forum to determine whether the prior orders of the Bankruptcy Court provided Kmart with any valid defenses to eviction.[7] (See Transcript of hearing before the Bankruptcy Court on September 29, 2004, at 11-12; 15-16, attached as Exhibit 6 to Harvard's Memorandum in Support of

---

[7]

As the Bankruptcy Court noted: "Moreover, the factual and procedural history leading to the entry of the assumption order is relatively straightforward and will not cause significant duplication of effort should the dispute eventually reach *a state court judge.*" (Transcript at 16) (Emphasis supplied).

Motion to Remand [Exhibit I to Rahbany Declaration]).

Perhaps most significant, and contrary to Kmart's assumptions, it is well accepted that Massachusetts courts in fact have exercised jurisdiction to determine the effect of prior bankruptcy court orders upon state law claims. *See, e.g.*, Massachusetts Higher Educational Assistance Corp. v. Taylor ("Taylor"), 390 Mass. 755, 761-762, 459 N.E.2d 807 (1984) (ruling on effect of general bankruptcy discharge on a particular debt under state law); BayBank v. Sullivan, 1998 Mass. App. Div. 112 (1998), 1998 WL 283204 ("It is well settled . . . that a state court has jurisdiction to determine whether a discharge in a Federal bankruptcy proceeding relieved the debtor of his obligation on a debt before the state court.") (citing Taylor). In fact, this is undeniably implicit in the holding of Rivet v. Regions Bank, 522 U.S. 470, 118 S.Ct.921 (1998), where the United States Supreme Court determined that the state court, not the federal court should determine the effect of prior Bankruptcy Court orders. The Court in Rivet emphasized that the defense of claim preclusion is properly made *in the state proceeding*, subject to the Supreme Court's ultimate review. Rivet, 522 U.S. at 578.

For all of these reasons, Kmart is plainly wrong in insisting that only the federal courts can interpret the Bankruptcy Code. In fact, none of the cases cited by Kmart to support removal jurisdiction are applicable to this summary process eviction case. The first category of cases cited by Kmart involves what is known as the "complete preemption doctrine", which has no applicability to Kmart's defenses on removal here.[8]  Far from the federal courts completely

---

[8]    Under the "complete preemption doctrine", courts have held that where federal law so completely occupies the field in an area of law, the federal court must exercise jurisdiction as "the real nature of the claim is federal, regardless of plaintiff's characterization". Federated Dept. Stores v. Moite, 452 U.S. 394, 397 n.2 (1981). This category of cases almost always

occupying the field with respect to eviction actions, the Bankruptcy Code clearly contemplates a role for the state courts with regard to traditional state law actions, particularly post-confirmation actions such as the present summary process eviction action.[9]

Kmart also appears to mistakenly rely upon another category of cases involving what is known as the "federal ingredient" doctrine, which "permits removal of a well pleaded claim sounding in state law which 'necessarily requires resolution of a substantial question of federal law.'" Metheny v. Becker, 352 F.3d 458 (1st Cir. 2003) (remanding and holding that removal was improper because no federal question was raised), quoting Almond v. Capital Properties, Inc., 212 F3d 20, 23 (1st Cir. 2000). See Livingstone v. Adler, 2004 WL 438927 (D. Mass. 2004) (Woodlock, J.) (granting plaintiff's motion to remand). However, as the First Circuit has again emphasized in its recent Rossello-Gonzalez case (Exhibit 1 attached hereto), "federal ingredient jurisdiction remains controversial." Rossello-Gonzalez, 2004 WL 2900370 at * 7.[10] In fact, Kmart has cited no cases where federal courts have accepted the federal ingredient

---

involves areas heavily regulated by federal law, such as in the federal labor law area, e.g., Franchise Tax Board v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S., 1, 27-28, 103 S.Ct. 2841 (1983), and under the Employee Retirement Income Security Act (ERISA), see, e.g., Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 107 S.Ct. 1542 (1987). Clearly, these types of cases cited by Kmart have no applicability here.

[9]    As is made clear throughout the ruling of the Bankruptcy Judge in the Transcript attached as Exhibit 6 to Harvard's Memorandum in Support of Motion to Remand [Exhibit I to Rahbany Declaration].

[10]    As noted in Almond, the "federal ingredient doctrine", which dates back to the 1920's, is "controversial", "unclear" as to scope, is "rarely applied in practice" and to the extent the doctrine endures in principle it "should be applied with caution and various qualifications." Almond, 212 F.3d at 23, quoting in part ALI, Study of the Division of Jurisdiction Between State and Federal Courts 179 (1969).

doctrine as a basis for federal removal jurisdiction to interpret the effect of prior Bankruptcy Court orders, yet the burden of proof is on Kmart to establish such jurisdiction. As Kmart has failed to cite any such cases to support its position, it fails to meet its burden of proof to establish federal question jurisdiction. Accordingly, this case should be remanded as federal question jurisdiction is clearly lacking.

Kmart clearly has the burden of proof to establish removal jurisdiction. None of the federal cases it cites to support removal are applicable to the present case. Since Kmart fails to recognize that it has the burden of proof to establish removal jurisdiction, and the case law it cites is inapplicable, this Court should accordingly reject Kmart's position and conclude that federal question jurisdiction is lacking under 28 U.S.C. § 1332.

**V.    PURSUANT TO 28 U.S.C. § 1447(c), THE COURT SHOULD ASSESS COSTS AND ATTORNEYS' FEES AGAINST KMART IF IT REMANDS THE CASE TO THE STATE COURT.**

Kmart argues that even if this Court allows Harvard's motion to remand, it should not award Harvard costs and attorney's fees under the removal statute "because Kmart removed this case in good faith and presented a substantial jurisdictional question." (Kmart Opposition at 19). However, the remand statute does not require that the removal be in bad faith. Rather, the remand statute authorizes the imposition of attorney's fees and costs upon a party that removes a case wrongfully. The federal jurisdiction asserted by Kmart is founded upon smoke and mirrors and is not justified by the case law. Kmart has caused Harvard great expense and delay by its wrongful removal. The Court should accordingly exercise its discretion to award Harvard its costs and reasonable attorney's fees related to its Motion to Remand.

## CONCLUSION

Kmart's Opposition to Harvard's Motion to Remand fails to sustain its burden to establish either diversity jurisdiction based upon the amount in controversy, or federal question jurisdiction.   As the Bankruptcy Court indicated, and as Massachusetts courts have clearly demonstrated, Massachusetts courts may readily determine the effect of prior orders of the Bankruptcy Court, particularly with regard to post-confirmation lease violations.  This Court should refuse to condone Kmart's forum-shopping approach.  It should find that Kmart has failed to establish federal subject matter jurisdiction in this commercial eviction case and remand the matter to the state court, where Kmart is free to attempt to raise its claim preclusion and issue preclusion defenses in the state forum.

Respectfully submitted,
Plaintiff,
Harvard Real Estate Allston-Inc.
By its attorneys,

Frank A. Flynn, Esq. (BBO# 551668)
Randolph C. English, Esq. (BBO# 628647)
Downing & Flynn
85 Devonshire Street, Suite 1000
Boston, MA 02109
(617) 720-3535

DATED:    January 7, 2005

## CERTIFICATE OF SERVICE

I, Frank A. Flynn, Esquire, Attorney for the Plaintiff, hereby certify that I have served the Defendant this date with a copy of this Harvard's Reply Brief in Support of Motion to Remand by hand delivering a copy of same to its counsel of record as follows:

> William R. Moorman, Jr., Esq.
> Kathleen A. Rahbany, Esq.
> Craig and Macauley Professional Corporation
> Federal Reserve Plaza
> 600 Atlantic Avenue
> Boston, MA 02210

this 7th day of January, 2005.

Frank A. Flynn, Esq.

# EXHIBIT   1

Westlaw.

2004 WL 2900370                                                                                    Page 1
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

**C**
**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.

Pedro J. ROSSELLÓ-GONZÁLEZ; Luis Fortuño;
Miriam Ramírez; Nanette Guevara;
Arnold Gil-Caraballo; Larry Seilhamer; José
Sánchez; Juan F. Ramírez and
Javier Rodríguez-Horta, Plaintiffs, Appellees,
v.
Sila M. CALDERÓN-SERRA, individually and in
her capacity as Governor of Puerto
Rico; Aníbal Acevedo-Vilá; The Incoming
Government Transition Committee;
Gerardo A. Cruz, individually and in his capacity as
a member of the Puerto
Rico Electoral Commission, Defendants, Appellants.
Pedro J. Rosselló-González; Luis Fortuño; Miriam
Ramírez; Nanette Guevara;
Arnold Gil-Caraballo; Larry Seilhamer; José
Sánchez; Juan F. Ramírez And
Javier Rodríguez-Horta, Plaintiffs, Appellees,
v.
The Puerto Rico Electoral Commission, a/k/a The
Commonwealth Election
Commission; Aurelio Gracia-Morales, Individually
And In His Capacity As
President Of The Puerto Rico Electoral
Commission; Thomas Rivera-Schatz,
individually and in his capacity as a member of the
Puerto Rico Electoral
Commission; Juan Dalmau-Ramírez, individually
and in his capacity as a member
of the Puerto Rico Electoral Commission,
Defendants, Appellants.
In re Gerardo A. Cruz, Petitioner.
In re State Elections Commission, Petitioner.

**Nos. 04-2610, 04-2611, 04-2612, 04-2613.**

Heard Dec. 10, 2004.

Decided Dec. 15, 2004.

**Background:** Losing candidate for governor of
Puerto Rico and his supporting voters brought §
1983 action against prevailing candidate, the Puerto
Rico Electoral Commission, the president of the
Electoral Commission and its three commissioners,
challenging the validity of certain ballots cast in the
gubernatorial election. The United States District
Court for the District of Puerto Rico, Daniel R.
Dominguez, J., issued a preliminary injunction,
ordering the Commission to identify and set aside,
but not consider, the contested ballots. Defendants
appealed. In a separate action, voters who supported
prevailing candidate brought action against
Electoral Commission and others in Puerto Rico
trial court to establish the validity of their ballots.
Following trial court's dismissal, such action was
removed to federal court. The Supreme Court of
Puerto Rico subsequently entered judgment
upholding the validity of the ballots. The United
States District Court for the District of Puerto Rico,
Daniel R. Dominguez, J., determined that the
judgment of the Supreme Court of Puerto Rico was
void. Actions were consolidated for appeal. Voters
petitioned for writ of mandamus, contesting the
removal and moved to remand.

**Holdings:** The Court of Appeals held that:
(1) writ of mandamus would be warranted to
address District Court's removal of voters' action to
establish validity of ballots;
(2) removal was not warranted; and
(3) general rule of non-intervention by federal
courts in local election disputes precluded District
Court's issuance of preliminary injunction.
Petition denied; injunction vacated with directions;
motions granted in part, and denied in part.

Torruella, Circuit Judge, filed concurring opinion.

Howard, Circuit Judge, filed separate concurring
opinion.

**[1] Mandamus** ☞53

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370                                                              Page 2
--- F.3d ---
**(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))**

250k53 Most Cited Cases
Although it is an extraordinary remedy, mandamus can be appropriate in those rare cases in which the issuance or non-issuance of an order (1) raises a question about the limits of judicial power, (2) poses a risk of irreparable harm to the appellant, and (3) is plainly erroneous.
**[2] Mandamus** ☜53
250k53 Most Cited Cases
The case for mandamus is particularly compelling where the order at issue poses an elemental question of judicial authority.
**[3] Mandamus** ☜141
250k141 Most Cited Cases
Writ of mandamus would be warranted to address District Court's exercise of removal jurisdiction over voters' action to establish validity of ballots cast in Puerto Rico's gubernatorial election; removal order concerned the boundaries of federal judicial power, the risk of irreparable harm from continued pendency of removal jurisdiction was acute, as there were less than three weeks remaining before the gubernatorial inauguration, and remand order was plainly erroneous because voters' action did not present claim of right arising under federal law. 28 U.S.C.A. § 1441.
**[4] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
The existence of a federal defense is not sufficient for removal jurisdiction. 28 U.S.C.A. § 1441(b).
**[5] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
Removal of voters' action to establish validity of ballots cast in Puerto Rico's gubernatorial election was not warranted; although action asserted violations of due process and equal protection, it did not explicitly state whether the source of those constitutional protections was the constitution for the Commonwealth of Puerto Rico or the federal constitution, there were no explicit references to any federal law, and a determination of whether a violation of Puerto Rico's constitutional guarantees of due process and equal protection did not require resolution of the question of whether the federal constitution was violated. 28 U.S.C.A. § 1441(b).
**[6] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
The plaintiff is the master of the claim, and may avoid federal jurisdiction by exclusive reliance on state law.
**[7] Removal of Cases** ☜107(7)

334k107(7) Most Cited Cases
The burden to prove that a federal question has been pled lies with the party seeking removal. 28 U.S.C.A. § 1441(b).
**[8] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
Under the "artful pleading doctrine," a plaintiff may not defeat removal jurisdiction by omitting to plead necessary federal questions in a complaint. 28 U.S.C.A. § 1441(b).
**[9] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
Under the "federal ingredient doctrine," a case arises under federal law for purposes of removal jurisdiction when the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law. 28 U.S.C.A. § 1441(b).

**[10] Federal Courts** ☜392
170Bk392 Most Cited Cases
Under Puerto Rico law, when the question before the Supreme Court of Puerto Rico refers to the validity of a Puerto Rico law under a clause of the constitution of the Commonwealth of Puerto Rico that is similar to a clause in the federal Constitution, the issue is a mixed question of federal and state rights that must be resolved by the federal court, because the validity of the statute under the federal Constitution necessarily disposes of the question under state law.
**[11] Courts** ☜97(5)
106k97(5) Most Cited Cases
Whether a state court will adopt as the meaning of the state's constitution the federal courts' interpretation of parallel language in the United States Constitution is a matter of state law..
**[12] Removal of Cases** ☜25(1)
334k25(1) Most Cited Cases
A determination of whether a violation of the Puerto Rico Constitution's guarantees of due process and equal protection has occurred does not require resolution of whether the conduct complained of would violate the federal Constitution, for purpose of determining the existence of a federal question that would require removal. 28 U.S.C.A. § 1441(b).
**[13] Elections** ☜24
144k24 Most Cited Cases
Federal courts normally may not undertake the resolution of garden variety local election

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370                                                                      Page 3
--- F.3d ---
**(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))**

irregularities.

**[14] Federal Courts ⚖10.1**
170Bk10.1 Most Cited Cases
A federal court may issue an injunction as a means to preserve its jurisdiction. 28 U.S.C.A. § 1651(a).

**[15] Federal Courts ⚖10.1**
170Bk10.1 Most Cited Cases
For a court to issue an injunction to protect its jurisdiction over an action, there must be at least the possibility that the complaint states a justiciable federal claim. 28 U.S.C.A. § 1651(a).

**[16] Federal Courts ⚖815**
170Bk815 Most Cited Cases
Review by Court of Appeals of district court's preliminary injunction to preserve its jurisdiction is for abuse of discretion. 28 U.S.C.A. § 1651(a).

**[17] Federal Courts ⚖5**
170Bk5 Most Cited Cases
**[17] Federal Courts ⚖30**
170Bk30 Most Cited Cases
Federal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case.

**[18] Federal Courts ⚖3.1**
170Bk3.1 Most Cited Cases
Standard for determining the existence of original federal jurisdiction is much more liberal than the standard for determining the existence of removal jurisdiction, at least outside of the complete preemption context. 28 U.S.C.A. §§ 1343, 1441.

**[18] Removal of Cases ⚖1**
334k1 Most Cited Cases
Standard for determining the existence of original federal jurisdiction is much more liberal than the standard for determining the existence of removal jurisdiction, at least outside of the complete preemption context. 28 U.S.C.A. §§ 1343, 1441.

**[19] Constitutional Law ⚖82(8)**
92k82(8) Most Cited Cases
Federal Constitution protects the right of all qualified citizens to vote in local elections.

**[20] Courts ⚖489(1)**
106k489(1) Most Cited Cases
Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the local courts.

**[21] Elections ⚖24**
144k24 Most Cited Cases
Generally, federal courts are not authorized to intervene in local elections.

**[22] Elections ⚖24**
144k24 Most Cited Cases
In order to determine whether intervention by a federal district court in a local election dispute is appropriate, each case must be evaluated on its own facts.

**[23] Injunction ⚖138.51**
212k138.51 Most Cited Cases
General rule of non-intervention by federal courts in local election disputes precluded District Court's issuance of preliminary injunction, ordering the Puerto Rico Electoral Commission to identify and set aside, but not consider, certain ballots cast in Puerto Rico's gubernatorial election, the validity of which were challenged by losing gubernatorial candidate and his supporting voters, in § 1983 action against Election Commission and its officers; the Commission had ordered that the ballots were required to be counted, so that challenging candidate and voters could not show that a discrete group of voters had been disenfranchised. 42 U.S.C.A. § 1983; 28 U.S.C.A. § 1651(a).

Appeals from the United States District Court for the District of Puerto Rico, Hon. Daniel R. Domínguez, U.S. District Judge.

María Soledad Pineiro, argued on behalf of respondents Manuel R. Suárez-Jiménez, Enid Abreu-Zurinaga, José A. Alvarez-Febles and Liany Fernández-Toledo.

Rafael Escalera-Rodriguez, argued on behalf of petitioners Gerardo A. Cruz and the State Elections Commission.

Richard H. Pildes, Professor of Law, New York University School of Law, with whom Pedro A. Delgado-Hernandez, Ramón L. Walker-Merino, Eileen Marie Garcia-Wirshing, and O'Neill & Borges, were on brief, for appellants The Puerto Rico Electoral Commission and Aurelio Gracia-Morales.

Charles J. Cooper, with whom Brian S. Koukoutchos, Vincent J. Colatriano, Derek L. Shaffer, Nicole J. Moss, and Cooper & Kirk, PLLC, were on brief, for appellant Aníbal Acevedo-Vilá.

Theodore B. Olson, with whom Miguel A. Estrada, Andrew S. Tulumello, Matthew D. McGill, Gibson Dunn & Crutcher LLP, James F. Hibey, William R.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sherman, Howrey Simon Arnold & White, LLP, Joseph D. Steinfield, Prince, Lobel, Glovsky & Tye, LLP, Luis Berrios-Amadeo, Andrés W. Lopez, The Law Offices of Andrés W. Lopez, Andrés Guillemard-Noble, Nachman & Guillemard, Charles A. Rodriguez, and David C. Indiano, were on brief, for appellees.

Rafael Escalera-Rodriguez, Néstor J. Navas-D'Acosta, Reichard & Escalera, Zuleika Llovet-Zurinaga, Carlos E. Lopez-López, and Llovet Zurinaga & López, PSC, were on brief, for appellant The Honorable Sila M. Calderon.

Pedro E. Ortiz-Álvarez, with whom Johanna Emmanuelli-Huertas, Jorge Martinez-Luciano, Gina Ismalia Gutierrez-Galang, and the Law Offices of Pedro E. Ortiz-Álvarez, PSC, were on brief, for appellant Gerardo A. Cruz.

Luis Sanchez-Betances, with whom Gerardo De Jesus-Annoni, and Sánchez Betances & Sifre, P.S.C., were on brief, for appellant The Incoming Transition Committee.

Before TORRUELLA, Circuit Judge, STAHL, Senior Circuit Judge, and HOWARD, Circuit Judge.

TORRUELLA, Circuit Judge; STAHL, Senior Circuit Judge; and HOWARD, Circuit Judge.

*1 The Commonwealth of Puerto Rico held general elections on November 2, 2004 for a variety of offices, including Governor and Resident Commissioner. Although over two million votes were cast, preliminary results indicate that the candidates from the Popular Democratic Party ("PDP") and the New Progressive Party ("NPP"), Aníbal Acevedo Vilá ("Acevedo") and Pedro Rosselló González ("Rosselló"), respectively, are separated by a very narrow margin--a few thousand votes. This extremely close election has raised emotions in Puerto Rico and spawned the actions that are before us on appeal.

Plaintiffs-Appellees include NPP candidate Rosselló and a number of voters who voted for him in the November 2, 2004 election (collectively, "the Rosselló Plaintiffs"). [FN1] Defendants-Appellants include PDP candidate Acevedo, the Puerto Rico Electoral Commission ("the Commission"), the president of the Commission, Aurelio Gracia Morales ("Gracia"), and its three commissioners (collectively, "the Acevedo Defendants"). [FN2] On November 10, 2004, the Rosselló Plaintiffs filed suit ("the Rosselló action") in the United States District Court for the District of Puerto Rico ("the District Court") in which they challenged, among other things, the validity of certain ballots that were cast in connection with the November 2, 2004 election. On November 24, 2004, the District Court issued an order that the Commission identify and set aside, but not consider, the contested ballots. The Acevedo Defendants seek review of that order.

Also part of this appeal is an action filed on November 16, 2004 in the Court of First Instance for San Juan, Puerto Rico, the local trial court, by four voters (collectively, "the Suárez Plaintiffs") who claim to have cast, and want to establish the validity of, the ballots at issue in the Rosselló action ("the Suárez action"). [FN3] After the Court of First Instance dismissed the Suárez action on November 18, 2004 as moot, the Supreme Court of Puerto Rico ("Supreme Court") assumed jurisdiction over the case. Yet, before the Supreme Court took any meaningful action, the case was removed to the District Court. Motions were promptly filed to remand the action to the Supreme Court, and we have since been asked to exercise our power of mandamus and instruct the District Court to remand the action.

## I. BACKGROUND
### A. The November 2, 2004 Election

On November 2, 2004, general elections were held for the offices of Governor and Resident Commissioner. [FN4] The ballot that was to be cast in connection with those two offices ("the ballot") listed only the candidates for those two offices under the insignia of their respective political parties. Puerto Rico's three major parties had candidates on the ballot for Governor: (1) Rosselló, from the NPP; (2) Acevedo, from the PDP; and (3) Rubén Berríos Martinez, from the Independence Party ("PIP"). The parties also had candidates on the ballot for Resident Commissioner.

*2 The ballot instructed voters to vote for only one candidate for Governor and one for Resident

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

Page 5

Commissioner. On election day, voters filled in the ballots in the following ways: (1) by placing a mark under a party insignia, thereby voting for all of the candidates in that party's column ("a straight vote"); (2) by placing a mark next to the name of each desired candidate but not under a party insignia; (3) by placing a mark under a party insignia and next to a desired candidate of a party other than the one that had its insignia previously marked; [FN5] or (4) by placing a mark under a party insignia and marks next to two desired candidates associated with a party or parties other than the one that had its insignia previously marked ("a three-mark split vote"). [FN6]

Prior to the November 2, 2004 election, the Commission, acting pursuant to its statutory authority, enacted regulations which outlined the procedures that were to be followed in adjudicating ballots, that is, in determining the validity of ballots and in awarding votes to the deserving candidates. [FN7] According to the procedures in place during the election in issue, each ballot was to be initially adjudicated, and each vote was to be tallied, at the polling location at which it was cast. [FN8] If those reviewing a ballot at a polling location were unable to unanimously agree on the adjudication of the ballot, it was to remain unadjudicated and sent to the Commission, along with the results of the adjudicated ballots, for review. The Commission was then to engage in a "general canvass," during which the results of the adjudicated ballots were to be checked and the contested ballots were to be counted or rejected according to the judgment of the three commissioners--each of whom represented one of the three principal parties. [FN9] If they could not reach a unanimous consensus, the ballot was to be forwarded to the president of the Commission for a final determination. [FN10]

Over two million votes were cast in the November 2, 2004 gubernatorial election. Within seventy-two hours of the closing of the polls, the Commission issued a preliminary report that Acevedo was leading Rosselló by 3,880 votes. As a result of the closeness of the election, and in accordance with its regulations, the Commission, on November 4, 2004, ordered that a recount occur simultaneously with the general canvass. But, the next day, the president of the Commission, Gracia, announced that the recount would not begin until the completion of the

general canvass.

During the election, thousands of three-mark split vote ballots--as many as 28,000--were cast. Apparently, the vast majority of these ballots contained a mark under the insignia of the PIP and marks next to the two PDP candidates. [FN11]

A number of the three-mark ballots were adjudicated at the polling centers on election night. [FN12] And, for the first two or three days of the general canvass, which began on November 8, 2004, some of the three-mark ballots that had been contested at the polling centers, and thus, had not been adjudicated, were determined to be valid. But, on November 11, 2004, a dispute arose when the NPP commissioner took the position that the ballots in question were void. Because the PDP and PIP Commissioners disagreed, the issue was referred to Gracia. On November 12, 2004, Gracia decided that the ballots contained valid votes for both the marked candidates and the marked party, and later that day, Gracia's decision was memorialized in a written resolution of the Commission.

### 1. *The Federal and State Court Actions*

**\*3** On November 10, 2004, the Rosselló Plaintiffs filed a complaint against the Acevedo Defendants in the District Court that asserted various federal constitutional claims under 42 U.S.C. § 1983 arising out of the November 2, 2004 election. On November 12, 2004, an amended complaint was filed alleging that the Commission's decision to (1) regard the three-mark ballots as valid and count the votes contained therein, (2) suspend the recount pending completion of the general canvass [FN13] and (3) disregard certain late-filed absentee ballots [FN14] violated a variety of their federal constitutional rights. [FN15] The Rosselló Plaintiffs sought declaratory and injunctive relief in connection with the above challenges. [FN16] The District Court scheduled a hearing for November 18, 2004. [FN17]

Meanwhile, on November 16, 2004, the Suárez Plaintiffs, who claim to have cast three-mark ballots, filed suit in the Court of First Instance seeking, among other things, a declaratory judgment as to the validity of the three-mark ballots and an injunction requiring the Commission to adjudicate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

Page 6

the ballots. [FN18] The Suárez Plaintiffs insisted that an invalidation of the ballots would deprive them of their right to vote and, thus, their "right to due process of law and to equal protection under the law." [FN19]

The Court of First Instance dismissed the Suárez action without prejudice on November 18, 2004 on the ground that no actual controversy existed because the Commission had already upheld the validity of the ballots. [FN20] That same day, the Suárez Plaintiffs, concerned that the validity of the ballots had not been adequately established, requested that the Supreme Court of Puerto Rico review the Court of First Instance's dismissal. The Supreme Court agreed to do so. On the morning of November 20, 2004, the commissioner of the NPP and the NPP itself, defendants in the Suárez action, removed the action to the District Court. Notice of removal was filed with the Supreme Court at 11:48 a.m. In response, the Suárez Plaintiffs and a defendant in the Suárez action, alleging various procedural defects in removal, [FN21] as well as lack of federal jurisdiction, moved the District Court to remand. Soon thereafter, two mandamus petitions were filed in this court, each one seeking an order requiring that the District Court remand the action.

Despite the removal, the Supreme Court purported to enter a judgment on the Suárez action on the evening of November 20, 2004. By a vote of four to three, it ordered that the three-mark ballots were to be adjudicated as containing valid votes for the marked candidates for Governor and Resident Commissioner, as well as the identified party for purposes of maintaining its principal party status, *see supra* note 6.

On November 20, 2004, the District Court issued an order in the Rosselló action that the Commission "set aside and segregate" the three-mark ballots and refrain from announcing the winner of the gubernatorial election. Then, on November 24, 2004, the District Court issued a memorandum that: (1) stated that the Supreme Court's judgment was void because the removal rendered the Supreme Court without jurisdiction to enter the judgment; [FN22] and (2) ordered that a recount be conducted by "counting the number of [three-mark] split ballots, identifying and segregating the same, but

*not adjudicating the ballots.*" (Emphasis in original.) The Acevedo Defendants appealed from the order that the three-vote ballots not be adjudicated.

## II. *THE PETITIONS FOR MANDAMUS*

*4 We begin with the two Emergency Petitions for Writ of Mandamus that request we exercise our power of mandamus and instruct the District Court to remand the Suárez case to the Puerto Rico courts. These mandamus petitions contest the validity of removal on two principal grounds: (1) the absence of federal question jurisdiction over the *Suárez* action, and (2) the failure of the removing parties to obtain the consent of all *Suárez* action defendants (including petitioners) to removal. Since both petitions are substantially the same, they will be discussed as one.

We note at the outset that we have given the District Court ample opportunity to decide whether removal of the Suárez action was proper, and despite the time-sensitive nature of this case, and three weeks of hearings on the merits of the Rosselló action which has been consolidated with this case for appeal, we are now faced with the extreme decision of whether we should compel remand through a Writ of Mandamus.

In order to stave off the need for mandamus, we invited the District Court to address these mandamus petitions. In response, the court appended a footnote to his opinion of November 30, 2004 in the District Court action in which he asserted jurisdiction over the parallel federal case. *Pedro Rosselló, et al. v. Sila M. Calderón, et al.,* No. 04-2251, slip op. at 3, n. 2 (D.P.R. Nov. 30, 2004). The footnote indicated that a hearing was needed to properly evaluate the jurisdictional issues raised in the pending motions to remand. Specifically, the District Court indicated: (1) that the *Suárez* plaintiffs' complaint had alleged violations of due process and equal protection without specifying whether the source of these protections was the Commonwealth or Federal Constitution; (2) that federal jurisdiction might be required under *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 22, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); and finally, (3) that the legal interests of some *Suárez*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendants might require their realignment with the plaintiffs in that action.

Following a hearing on December 8, 2004, the District Court issued an opinion resolving various challenges to the removal jurisdiction. *Manuel R. Suárez, et al. v. Comisión Estatal de Elecciones, et al.,* No. 04-2288, slip op. (D.P.R. Dec. 10, 2004)(hereinafter "Remand Opinion"). In that opinion, the District Court held that "examining the evidence in the light most favorable to the defendants ... an overvote issue may exist[ ] in violation of Due Process and Equal Protection principles under the case of *Bonas v. Town of North Smithfield,* 265 F.3d 69 (1st Cir.2001)." Remand Opinion at 12-13; *see also Bonas,* 265 F.3d at 73-74 . [FN23] Although it evaluated and rejected the majority of the arguments against removal before it, the District Court still has not made a final decision on the ultimate question of whether to remand the case to the Puerto Rico courts. Nevertheless, the District Court determined in its December 10 opinion that a federal question had been presented in the Suárez complaint. That determination was plainly erroneous, and our resolution of the Rosselló case today is decisive of the motion to remand. Because the District Court plainly erred, and because every additional day spent adjudicating this issue before the District Court or on appeal before this Court increases the risk of irreparable harm, our intervention by Writ of Mandamus would be appropriate.

**A. *Availability of Mandamus***

**\*5** [1][2][3] Although it is an extraordinary remedy, mandamus can be appropriate in those rare cases in which the issuance (or non-issuance) of an order (1) raises a question about the limits of judicial power, (2) poses a risk of irreparable harm to the appellant, and (3) is plainly erroneous. *See Christopher v. Stanley-Bostich, Inc.,* 240 F.3d 95, 99 (1st Cir.2001). Moreover, "the case for mandamus is particularly compelling where the order poses an elemental question of judicial authority." *Id.* at 99-100. The instant petitions clearly meet the first requirement, as they concern the boundaries of the federal district court's power to remove cases from Commonwealth courts. *See, e.g., Hernández-Agosto v. Romero-Barceló,* 748 F.2d 1, 4-5 (1st Cir . 1984) (issuing mandamus to

remand improperly removed action to Puerto Rico court). Second, the risk of irreparable harm from the continued pendency of removal jurisdiction is acute: there are now fewer than three weeks remaining before inauguration day on January 2, 2005. Third, as elucidated below, we find that the District Court's failure to remand is plainly erroneous because the *Suárez* plaintiffs presented no claim of right arising under federal law. *See* 28 U.S.C. § 1441.

**B. *Validity of Removal***

We find that the exercise of removal jurisdiction is plainly erroneous in this case because no federal question was presented in the *Suárez* action either procedurally (because the four corners of the complaint do not plead a federal question) or substantively (because we have decided in the Rosselló action that the federal courts will not intervene in a local electoral dispute). Because we find that remand to the Puerto Rico Supreme Court is necessary due to the absence of a federal question, we do not address the petitioners' second argument, that removal was improper because it did not receive the consent of all defendants to the *Suárez* action.

**1. *Well-Pleaded Complaint Rule***

[4][5] A case may be removed to federal court if it presents a "claim or right arising under the Constitution, treaties or laws of the United States." 28 U.S.C. § 1441(b). "The Supreme Court of the United States has made clear that, in deciding (for removal purposes) whether a case presents a federal 'claim or right,' a court is to ask whether the plaintiff's *claim to relief* rests upon a federal right, and the court is to look only to *plaintiff's complaint* to find the answer." *Hernández-Agosto v. Romero-Barceló,* 748 F.2d 1, 2 (1st Cir.1984) (emphasis in original). The existence of a federal defense is not sufficient for removal jurisdiction. *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 10-11, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Thus, we must turn to the Suárez complaint to ascertain whether, within its four corners, a federal "claim or right" has been presented. Our evaluation centers on the complaint's allegations of violations of "due process" and "equal protection." [FN24] These claims do not

. © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

Page 8

explicitly state whether the source of these constitutional protections is the Commonwealth or the Federal Constitution. [FN25]

*6 Read as a whole, we cannot say that this complaint presents a claim under the federal Constitution. No explicit reference to the United States Constitution or any other federal law is contained in the complaint; instead, all references are to Puerto Rico state laws, regulations, and the Commonwealth Constitution. Specifically, paragraph 11 of the complaint bases the Suárez Plaintiffs' claims in the right to vote guaranteed in Article II, Section 2, of the Commonwealth Constitution. The complaint's subsequent references to the plaintiffs' rights to vote and to have their votes counted in accordance with equal protection and due process, while not expressly premised on the Puerto Rico Constitution, logically refer back to the antecedent citation to Article II, Section 2 of the Commonwealth Constitution.

[6][7] Moreover, it is well-settled that "the plaintiff [is] the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Thus, the burden to prove that a federal question has been pled lies with the party seeking removal. BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers, 132 F.3d 824, 831 (1st Cir.1997). In light of this burden, and of the important federalism concerns at play in considering removal jurisdiction, see, e.g., Franchise Tax Bd., 463 U.S. at 8, we find that any ambiguity as to the source of law relied upon by the Suárez plaintiffs ought to be resolved against removal. See Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941) (removal statute should be strictly construed against removal).

2. Artful Pleading Doctrine

[8] The Respondents invite this court to consider the possibility that the Suárez plaintiffs engaged in artful pleading, a "corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." Franchise Tax Bd., 463 U.S. at 22. As discussed below with regard to

federal ingredient jurisdiction, no federal question is necessary to the resolution of the state claims raised in the Suárez complaint. Furthermore, we are skeptical of the applicability of the artful pleading doctrine outside of complete federal preemption of a state cause of action. See, e.g., id. at 23 (stating that the "necessary ground" for the creation of the artful pleading doctrine "was that the preemptive force of [a federal statute was] so powerful as to displace entirely any state cause of action"); Rivet v. Regions Bank, 522 U.S. 470, 475-76, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."). And surely, the United States Constitution cannot be said to wholly preempt the Commonwealth's grant of similar rights under its own Constitution. See PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (state constitution may afford more, but not less, protection than Federal Constitution); see also Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 275 (1st Cir.1993) (noting that " 'poverty' is considered a suspect classification under the Commonwealth constitution, triggering 'strict scrutiny' analysis unobtainable under the Equal Protection Clause of the United States Constitution"). Thus, the artful pleading doctrine has no application to this dispute.

3. Federal Ingredient

*7 [9] Respondents also argue that even in the absence of a claim arising under federal law on the face of plaintiffs' well-pleaded complaint, federal removal jurisdiction is still proper under the Supreme Court's statement in Franchise Tax Board that removal would be appropriate "if [the plaintiff's] right to relief under state law requires resolution of a substantial question of federal law." 463 U.S. at 13. Under this "federal ingredient" doctrine, a case arises under federal law for purposes of removal when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Id. at 27-28.

Federal ingredient jurisdiction remains "controversial," Almond v. Capital Properties, Inc., 212 F.3d 20, 23 (1st Cir.2000), because [t]he Supreme Court has periodically affirmed this basis for jurisdiction in the abstract ...,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

occasionally cast doubt upon it, rarely applied it in practice, and left the very scope of the concept unclear. Perhaps the best one can say is that this basis endures in principle but should be applied with caution and various qualifications.

*Id.* (internal citations and footnote omitted); *see also Metheny v. Becker,* 352 F.3d 458, 460 (1st Cir.2003) (noting that federal ingredient doctrine "remains vibrant in this circuit but 'should be applied with caution' " (quoting *Almond,* 212 F.3d at 23)). With this caution in mind, we turn to the respondents' argument.

[10] Respondents hang their jurisdictional hat on two doctrines that they allege exist in the caselaw of the Puerto Rico Supreme Court. The first stems from the Puerto Rico Supreme Court's statements in a 1964 case that, in accepting the Commonwealth's Bill of Rights, the United States Congress "was to presume--and in fact it is so and ought to be--that the public powers and the courts of the Commonwealth shall render effective and construe the provisions of the [Puerto Rico] Bill of Rights in a manner consistent with the protection afforded ... by the same or similar provisions of the Constitution of the United States." *R.C.A. Communications, Inc. v. Gov't of the Capital,* 91 P.R.R. 404, 414-15 (P.R.1964). The second comes into play when a federal court certifies a question of state law to the Puerto Rican Supreme Court. According to the Supreme Court:

[W]hen the question before us refers to the validity of a state law under a clause of the state constitution that is similar to a clause in the federal Constitution ... the issue is a mixed question of federal and state rights that must be resolved by the federal court, because the validity of the statute under the federal Constitution necessarily disposes of the question under state law.... In these circumstances we must refuse certification, since our decision would be only advisory.

*Pan Am. Computer Corp. v. Data Gen. Corp.,* 112 D.P.R. 780, 793-94 (1982). According to Respondents, these two provisions mean that the Supreme Court's evaluation of the *Suárez* plaintiffs' claims under the due process and equal protection doctrines of the Commonwealth Constitution will *require* the resolution of a federal question: whether the parallel provisions of the United States Constitution would be violated by the acts in

question. Accordingly, Respondents argue, the federal district court has removal jurisdiction under the federal ingredient doctrine.

*8 [11][12] These arguments fundamentally misconstrue the federal ingredient doctrine. Whether a state court will adopt as the meaning of the state's constitution the federal courts' interpretation of parallel language in the United States Constitution is a matter of *state law. See, e.g., Nieves,* 7 F.3d at 274. Federal law does not compel such an outcome. Thus, a determination of whether a violation of the Puerto Rican Constitution's guarantees of due process and equal protection has occurred does not "*require* resolution" of whether the conduct complained of would violate the federal Constitution. *Franchise Tax Bd.,* 463 U.S. at 13 (emphasis added); *see also Gully v. First Nat'l Bank,* 299 U.S. 109, 112-13, 57 S.Ct. 96, 81 L.Ed. 70 (1936) ("To bring a case within the [removal] statute, a right or immunity created by the Constitution ... must be an element, *and an essential one,* of the plaintiff's cause of action.") (emphasis added). To decide otherwise would mean that *any* case brought under a provision of the Puerto Rico Constitution that mirrors the language of the United States Constitution could be removed into federal court. Accordingly, we find that removal jurisdiction over the Suárez action is lacking, and it must be remanded to the Commonwealth court from which it was removed. 28 U.S.C. § 1447.

### 4. *Effect of the Rosselló Decision*

Lastly, and perhaps most significantly, the Suárez complaint cannot be said to state a federal question, because, as we will discuss now, the federal courts will not intervene in a local electoral dispute such as this. Although we find that it was plain error for the District Court not to remand the Suárez case back to the Puerto Rico courts on the basis of the well-pleaded complaint rule, and therefore we could issue a Writ of Mandamus compelling remand, we realize that the District Court now has the benefit of both our above discussion and our decision in the Rosselló action. Therefore, we are confident that the District Court will immediately remand the Suárez case back to the Supreme Court of Puerto Rico without the need for mandamus.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### III. APPEAL OF THE NON-ADJUDICATION ORDER

[13] We now turn to the appeal of the non-adjudication order that is before us in connection with the Rosselló action. We have repeatedly held that federal courts "normally may not ... undertake the resolution of 'garden variety election irregularities.' " *Bonas v. Town of North Smithfield,* 265 F.3d 69, 74 (1st Cir.2001) (quoting *Griffin v. Burns,* 570 F.2d 1065, 1076 (1st Cir.1978) ). We have departed from this general rule of non-intervention on only two occasions. *See Bonas,* 265 F.3d at 75-76; *Griffin,* 570 F.2d at 1079. As we elucidate below, those two cases are easily distinguished from the case at hand. Here, Circuit precedent demands application of the general principle of non-intervention, and therefore, we vacate the issuance of the preliminary injunction and direct the District Court to dismiss the case.

#### A. *Nature of Our Review*

\*9 The Acevedo Defendants are presently before us seeking review of the District Court's issuance of a preliminary injunction to segregate, but not adjudicate, all three-mark split vote ballots cast during the November 2, 2004 election. It appears from the language in the order implementing the injunction that the District Court issued the injunction merely to preserve its jurisdiction, and therefore we will treat it as such. [FN26]

#### B. *Temporary Injunctions to Preserve Jurisdiction*

[14][15] Congress has provided "[t]he Supreme Court and all courts established by Act of Congress [with the authority to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Acting pursuant to § 1651(a), a federal court may issue an injunction as a means to preserve its jurisdiction. *See, e.g., Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1099 (11th Cir.2004). But, for a court to invoke § 1651(a) and issue an injunction to protect its jurisdiction over an action, there must be at least the possibility that the complaint states a justiciable federal claim. Thus, implicit in our review of the issuance of the injunction is our review of whether the Rosselló Complaint, taking all claims alleged therein as proven, had the potential to present a justiciable

federal claim under existing Circuit precedent. *Mercury Motor Express, Inc. v. Brinke,* 475 F.2d 1086, 1091 (5th Cir.1973) ("Once a case is lawfully before a court of appeals, it does not lack power to do what plainly ought to be done.... [It has] the power ... to reach the merits of a case before it on an interlocutory appeal and [to] dismiss the action.") (internal quotation marks, alterations, and citations omitted); *see also Aerojet-Gen. Corp. v. Am. Arbitration Ass'n,* 478 F.2d 248, 252 (9th Cir.1973) ("[I]t is well established that in [an equity] case, ... an interlocutory appeal brings the entire case before the court.").

[16] Our review is for abuse of discretion. *Klay,* 376 F.3d at 1096.

#### C. *Federal Jurisdiction Over § 1983 Complaints*

[17] Having determined that we must inquire whether the District Court should have intervened in this local election dispute based on the claims alleged in the complaint, our first step necessarily begins at the broadest level--that is, whether the District Court had federal subject matter jurisdiction over the action. *See Bonas,* 265 F.3d at 73. "Federal courts are courts of limited jurisdiction, and therefore must be certain that they have explicit authority to decide a case." *Bonas,* 265 F.3d at 73 (citing *Irving v. United States,* 162 F.3d 154, 160 (1st Cir.1998) (en banc)). "Thus, we subject the plaintiffs' choice of a federal forum to careful scrutiny." *Bonas,* 265 F.3d at 73.

[18] In *Griffin,* we set forth the analytical framework to evaluate whether a federal court could exercise jurisdiction over a local electoral dispute. *See* 570 F.2d at 1070; *see also Bonas,* 265 F.3d at 73. As this case is brought pursuant to 42 U.S.C. § 1983, we turn to the language of the jurisdictional counterpart of that statute, 28 U.S.C. § 1343(3), which mirrors § 1983, and provides that "district courts shall have original jurisdiction of any civil action ... [t]o redress the deprivation, under color of State law, statute, ... custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens...." 28 U.S.C. § 1343(3). Thus, federal jurisdiction hinges on whether plaintiffs have a colorable claim under § 1983. [FN27] *See Griffin,* 570 F.2d at 1070; *see*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*also Bonas*, 265 F.3d at 73-74 ("In other words, federal courts have jurisdiction over claims arising out of a state or local electoral dispute if, and to the extent that, the complaint limns a set of facts that bespeaks the violation of a constitutionally guaranteed right.").

*10 [19] There is no doubt that the Rosselló Complaint alleges the violation of a constitutionally guaranteed right, and thus, presents a colorable claim under § 1983 for subject-matter-jurisdiction purposes. The federal Constitution protects the right of all qualified citizens to vote in local elections. *See Bonas*, 265 F.3d at 74. This conclusion, however, does not end our inquiry. Having determined that the District Court could have exercised jurisdiction in this case, we must now inquire whether it should have intervened. *See Griffin*, 570 F.2d at 170.

[20][21] As mentioned above, and discussed more extensively below, "[e]lection law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the [local] courts." *Bonas*, 265 F.3d at 74. We have thus stated that "with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections." *Id.*, 265 F.3d at 74. This general rule of non-intervention dictates that the District Court should not have intervened in this case.

D. *District Court's Decision to Intervene*

[22] As discussed above, we review the decision of the District Court to intervene in this local election dispute for abuse of discretion. *Klay*, 376 F.3d at 1096. In evaluating whether federal intervention into a local election dispute is appropriate, this Court has inquired into factors such as whether a discrete group of voters has been disenfranchised, whether there was a state process in place to handle the question posed by the plaintiffs, and whether the plaintiffs had availed themselves of that state process. *See Griffin*, 570 F.2d at 1078-79; *Bonas*, 265 F.3d at 75-76; *see also Barreto Pérez*, 639 F.2d at 828. As we stated in *Bonas*, however, "[w]e do not pretend that it is a simple matter to segregate the run-of-the-mill electoral disputes from those that appropriately can be characterized as harbingers of patent and fundamental fairness." 265 F.3d at 75.

Indeed, "each case must be evaluated on its own facts." *Bonas*, 265 F.3d at 75. But, as this Court implied in *Barreto Pérez*, there is a heavy presumption in favor of non-intervention if the party requesting intervention cannot show that a discrete group of voters has been disenfranchised by the challenged local action. *See* 639 F.2d at 828.

[23] Here, the final decision under Puerto Rico law to adjudicate all three-mark ballots under one consistent standard does not disenfranchise any Puerto Rico voters—indeed, it is the position espoused by the Rosselló Plaintiffs that stands to disenfranchise an estimated 28,000 voters. Thus, because the Rosselló Plaintiffs cannot claim that federal intervention is necessary because a discrete group of voters has been disenfranchised, and because they cannot allege any other harm sufficient to overcome the general rule of non-intervention, [FN28] we conclude that it was an abuse of discretion for the District Court to exercise jurisdiction over this local election dispute.

*11 In *Griffin v. Burns*, this Court determined that federal intervention into a state election was appropriate where a significant percentage of the qualified and voting electorate was, in effect, denied its vote. *See* 570 F.2d at 1078-79. In that case, although it was undisputed that Rhode Island had issued and counted absentee and shut-in ballots in prior primaries, and that voters utilizing such ballots had relied on that prior practice and on instructions from state officials in so doing, the Rhode Island Supreme Court said the Rhode Island Secretary of State was without the authority to issue and count absentee and shut-in ballots in a primary election, effectively disenfranchising all absentee and shut-in voters that had already voted. *See Griffin*, 570 F.2d at 1075-76.

In *Bonas v. Town of North Smithfield*, this Court held that complete disenfranchisement of all voters, by a municipality's decision not to hold a municipal election at all, warranted federal intervention. *See* 265 F.3d at 75-76. In that case, after the voters of North Smithfield, Rhode Island agreed in a 1998 referendum to transition the Town from an odd-year election cycle to an even-year cycle, with the first even-year election to take place in 2002, town officials, without authorization, held the 1999 election, but held no election in either 2000 or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

Page 12

2001, effectively disenfranchising all persons eligible to vote in the 2001 municipal election. *Bonas,* 265 F.3d at 71-72.

In *Partido Nuevo Progresista v. Barreto Pérez,* 639 F.2d 825 (1st Cir.1980), however, this Court determined that federal intervention was inappropriate in a case challenging the decision of the Supreme Court of Puerto Rico where "[the] case [did] not involve a state court order that dis enfranchise[d] voters; rather it involve[d] a Commonwealth decision that en franchise[d] them." 639 F.2d at 828. That case is remarkably similar to the case at hand. In that case, the disputed ballots contained marks outside the designated spaces and squares, and therefore were allegedly invalid under the literal terms of Article 1.033(b) of the Electoral Law of Puerto Rico, which provided that stray marks such as the ones on the disputed ballots "shall be null and void, and deemed unmarked." *See Barreto Pérez,* 639 F.2d at 826. The Administrator of the Election Commission ruled the ballots invalid, and his decision was upheld on appeal by the Electoral Review Board. *See Barreto Pérez,* 639 F.2d at 826. The Supreme Court of Puerto Rico reversed, finding that despite 16 L.P.R.A. § 3033(b)'s literal prohibition of counting such mismarked ballots, the provision could be construed as permitting the tallying of such ballots where the "intent of the voter was clear." *See Barreto Pérez,* 639 F.2d at 826 (discussing *Popular Democratic Party v. State Elections Commission,* 507 F.Supp. 1164 (D.P.R.1980)). The PNP subsequently brought suit in federal court pursuant to § 1983, alleging that the Supreme Court of Puerto Rico's "retroactive" changing of the law after an election violated the plaintiffs' rights not to be deprived of their liberty and First Amendment rights without procedural and substantive due process of law. *Barreto Pérez,* 639 F.2d 827. The district court agreed, stating that "[i]n our opinion the lesson to be learned from *Griffin* is[ ] that changing the rules of the game after it has been played and the score is known, violates fundamental rules of fair play." *Popular Democratic Party,* 507 F.Supp. at 1174. It found that the "counting of ballots after an election which, under the rules prevalent at the time of the vote-casting were considered void and invalid, [was] the practical and functional equivalent of alteration of ballots or of stuffing the ballot box." *Barreto Pérez,* 507 F.Supp. at 1174. On appeal, this Court disagreed. *See Barreto Pérez,* 639 F.2d at 828.

*12 We emphasized that unlike in *Griffin,* where the disputed local action involved the disenfranchisement of a discrete group of voters, the local action at issue in *Barreto Pérez* actually enfranchised voters. *See* 639 F.2d at 828. Instead of disenfranchisement, the plaintiffs in *Barreto Pérez* claimed that "votes were 'diluted' by the votes of others, not that they themselves were prevented from voting." 639 F.2d at 828. Moreover, the case was also unlike *Griffin* in that "had those casting absentee ballots known of their possible invalidity, many might have gone to the polls and voted in person." *Id.* In *Barreto Pérez,* however, "there was no such reliance upon an official interpretation of the local election law; no party or person is likely to have acted to their detriment by relying upon the invalidity of ballots with marks outside the ballots' drawn rectangles." *Id.* The court concluded that the case did not fall "within the purview of *Griffin* but within the area delineated by the Second Circuit, in *Powell v. Power,* 436 F.2d 84 (1970), as inappropriate for federal court review in a civil rights action, lest the federal court 'be thrust into the details of virtually every election.' *Id.* at 86." *Id.*

The case presented by the Rosselló Plaintiffs, even assuming that all claims alleged in their complaint could be proven, presents even less cause for federal intervention than the circumstances which we found lacking in *Barreto Pérez.* Here, there is no clearly articulated Commonwealth policy, much less a statute, to indicate the three-mark split vote ballots were invalid. At most, the decision of the Commission merely *clarified* previously unsettled law. Furthermore, this case is distinguishable from *Griffin* and *Bonas,* because "this case does not involve a state court order that dis enfranchise[d] voters; rather it involves a Commonwealth decision that en franchises them." *See Barreto Pérez,* 639 F.2d at 828. Therefore, it was an abuse of discretion for the District Court to determine that the Rosselló Plaintiffs' complaint could possibly state a claim with grounds for federal intervention, and as a result, it was necessarily an abuse of discretion for the District Court to grant a preliminary injunction preserving jurisdiction in a case in which our Circuit precedent clearly required the District Court not to intervene.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

Page 13

### IV. *CONCLUSION*

For the above reasons:

The Petitions for Writ of Mandamus are **DENIED,** as the District Court has no choice but to remand the Suárez case to the Supreme Court of Puerto Rico in light our disposition of the Rosselló appeal.

We *VACATE* the issuance of the preliminary injunction with the direction that the District Court dismiss with prejudice all claims in the Rosselló complaint relating to the adjudication of the three-mark ballots, and all claims relating to the simultaneous general canvass/recount issue. The District Court is also directed to dismiss without prejudice the claims relating to the absentee ballots, and any alleged violations of Puerto Rico Law 197.

*13 Because the supplemental materials proffered by the appellants are unnecessary to our decision, the motions to supplement the record on appeal are **DENIED AS MOOT.** We likewise **DENY** the appellees' request for judicial notice.

Leave to file an amicus brief is **GRANTED** to the Puerto Rico Association of Mayors, the Puerto Rico Commonwealth Employee Association and the Board of Directors of Cumbre Social, the Colegio de Abogados de Puerto Rico (oversized brief), Efraín Cintrón García, and Gerardo Ramírez. We acknowledge the assistance of amici.

Any petition for rehearing or rehearing *en banc* must be filed no later than 12 noon Eastern Standard Time on Tuesday, December 21, 2004. *See* Fed. R.App. P. 40(a)(1).

TORRUELLA, Circuit Judge (in additional concurrence).

Although I shared equally with my colleagues in analyzing the law and determining the outcome of these cases, I find it appropriate to set forth some additional observations in light of the circumstances surrounding these appeals.

Although, as expressed in our panel opinion, our circuit precedents in *Griffin, Barreto Pérez,* and *Bonas* finally decide the issue that the district court should not have intervened in this case, I wish to point out that this conclusion is based on the

particular facts of this case, which makes *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), inapplicable. The present circumstances do not support a justiciable federal vote-dilution claim by voters who cast ballots that were clearly valid under rules changed after the election. *See Bush,* 531 U.S. at 106-107 (criticizing as inconsistent with equal protection Miami-Dade County's alteration, during recount, between 1990 rules for ballot validity and new, *ad hoc* rules). What happened here was not a *change* in the Puerto Rico's established rules with regard to three-mark split vote ballots, but rather a *clarification* of the status of the ballots, whose validity or invalidity had not before been clearly established as a matter of Puerto Rico election policy.

More important in my opinion, the preeminent truth to be gleaned from the *Bush* opinion is that the United States is, first and foremost, a nation of laws and that the meaning of these laws is interpreted by the courts, whose rulings become the Law of the Land. Thus, notwithstanding the unprecedented nature of the *Bush v. Gore* decision, issued in the face of a very divided nation, its binding finality was accepted by the citizenry as a whole, irrespective of individual or collective disagreement with its outcome. Although undoubtedly there was much dissonance, as there may well presently be in Puerto Rico, the nation turned a figurative page and acquiesced. This response reflected our nation's longstanding recognition that:

[c]ompliance with decisions of [the judiciary], as the constitutional organ [interpreting] the supreme Law of the Land, has often, throughout our history, depended on active support by state and local authorities. It presupposes such support.
*14 *Cooper v. Aaron,* 358 U.S. 1, 26, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (Frankfurter, J., concurring).

Indeed, the basic principle articulated by Justice Frankfurter in *Cooper* is so foundational to our political system that it is literally set in stone on the very walls of this federal courthouse: "[T]he responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding...." *Id.* I urge the People of Puerto Rico, and the parties in these appeals, to remember these words as they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stand at this important crossroads in our shared history as a society joined by our respect for democratic values, underpinned by the rule of law. For, as Justice Frankfurter so ably stated:

> [F]rom their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised.... The duty to abstain from resistance to "the supreme Law of the Land" ... as declared by the organ of our Government for ascertaining it, does not require immediate approval of it nor does it deny the right of dissent. Criticism need not be stilled. [However] active obstruction or defiance is barred....

*Id.* at 23-25.

As important as the outcome of this election may presently be, there are more fundamental issues at stake.

HOWARD, Circuit Judge (in additional concurrence).

I have joined in the court's disposition of these cases. I am less sure about our resolution of certain, discrete issues raised by the *Rosselló* appeal, and I identify those concerns here.

1. The district court did not categorize the order preventing the Commission from adjudicating the ballots. *See* Fed.R.Civ.P. 65(d); *Ben David v. Travisono,* 495 F.2d 562, 563 (1st Cir.1974). As I see it, the order might plausibly be characterized as an All Writs Act Injunction, a traditional injunction under Fed.R.Civ.P. 65, or a case management order. Under the first two possibilities, we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1); under the third we do not. *See Matter of City of Springfield,* 818 F.2d 565, 567-68 (7th Cir.1987).

In the end, we need not decide this issue. Even if the order is properly characterized as only a case management directive, we are entitled to review it under our mandamus power. *See Ramírez v. Rivera-Dueño,* 861 F.2d 328, 334 (1st Cir.1988). In my view, we should do so, given the jurisdictional issue at the heart of this case, the coercive and intrusive nature of the order, the federalism and comity concerns that it raises, and the highly charged circumstances in which it was issued. And

because the question of the order's propriety cannot be decided without an analysis of whether the *Rosselló* action is justiciable, I concur in the decision to proceed directly to the merits and to order the action dismissed.

2. Notwithstanding our statement that the district court has federal question jurisdiction over the case, we have concluded that the district court abused its discretion by asserting jurisdiction over it. I would rather we characterize the matter somewhat differently. There is no question, of course, that the district court has subject matter jurisdiction of a federal civil rights claim pleaded under 42 U.S.C. § 1983. The issue is whether the pleaded federal claim is justiciable. This question is not a matter of discretion; it is an issue of law. *See Bonas v. Town of N. Smithfield,* 265 F.3d 69, 73-75 (1st Cir.2001). And it is an issue of law that implicates the court's "jurisdiction" only in the sense that justiciability is regarded as a jurisdictional doctrine. *See id.*

***15** 3. Finally, citing *Partido Nuevo Progresiva v. Barreto Pérez,* 639 F.2d 825, 827-28 (1st Cir.1980) , we have emphasized that the "change of rules" claim fails because, even if there was such a change, it would result in enfranchising some voters rather than disenfranchising them. But after *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) , I cannot discount the possibility that a viable federal vote-dilution claim might lie in some circumstances where a post-election rule change has the effect of causing previously invalid ballots to be adjudicated. I do, however, think that the vote-dilution claims pleaded in this case were properly rejected because I agree with Judge Torruella that, on the pleadings and the record, only one conclusion is possible: the Commission's ruling involved only the *clarification* of previously unsettled law. In my view, this is not a "change in the rules" sufficient to implicate federal interests.

> FN1. Luis Fortuño, the NPP candidate for Resident Commissioner, is also a Plaintiff-Appellee.

> FN2. Acevedo's Incoming Government Transition Committee is likewise a Defendant-Appellant.

> FN3. The following are the defendants in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Suárez action: (1) the Commission, (2) the president of the Commission, (3) the three commissioners, (4) Rosselló, and (5) the NPP.

FN4. The Resident Commissioner is Puerto Rico's non-voting representative in Congress.

FN5. The Commission has determined that such a ballot reflects a vote for the desired candidate and the remaining candidate under the party insignia.

FN6. As determined by the Commission, *see infra*, a three-mark split vote ballot reflects a vote for the two marked candidates, as well as a vote for the party. A vote for a party on a three-mark ballot is credited to the party itself (and not to any of its candidates) for purposes of its reclassification as a "principal party," which entitles it to certain benefits, including the right to receive funding. *See* 16 P.R. Laws Ann. §§ 3003; 3116. A party is a principal party if, for example, it "obtained a number of votes under ... its insignia on the ballot of Governor and Resident Commissioner[ ] of not less [than] seven (7) percent of the total number of votes cast for all the parties' insignias in the preceding general election." § 3003(42) (second alteration in original).

FN7. *See* 16 P.R. Laws Ann. §§ 3007(k), 3013(l).

FN8. Each ballot was to be adjudicated by a group of three inspectors, consisting of one representative from each of the three principal parties. If the inspectors were unable to agree, there were additional levels of review at each polling location. The adjudicatory bodies at each level were comprised of one representative from each of the three principal parties.

FN9. Although this is a somewhat simplified account of the general canvass procedures, the omitted details are irrelevant to this appeal.

FN10. "Any party affected by a resolution, ruling or order of the [ ] Commission may, within the ten (10) days following the notice thereof, appeal to the Court of First Instance...." 16 P.R. Laws Ann. § 3016a.

FN11. It has been alleged that, on some of the three-mark split vote ballots: (1) the mark under the PIP insignia was made in pencil while the marks next to the PDP candidates were made in pen; and (2) the marks next to the PDP candidates were noticeably dissimilar from the mark made under the PIP insignia.

FN12. There is, however, a dispute as to whether these ballots were adjudicated in a consistent fashion. It has been alleged that some of the ballots were declared void, some were adjudicated as containing valid straight votes for the PIP candidates, and some were adjudicated as containing valid split votes for the PDP candidates, as well as the PIP.

FN13. The Rosselló Plaintiffs, by their own concession, "have achieved complete and substantial relief" on this claim, and therefore, we need not give it any further consideration.

FN14. The Rosselló Plaintiffs have conceded, both in their opening brief and at oral argument, that they "have achieved complete and substantial relief" from the Commission with respect to this claim. To be sure, there is still a question as to whether the Commission will follow through with the relief it has promised. But, any claim concerning this open question is not yet ripe.

FN15. In addition, the Rosselló Plaintiffs have alleged that the Commission violated their constitutional rights when it made "substantial changes" to the rules governing the election after the votes had been cast.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

FN16. The Rosselló Plaintiffs also sought injunctive and declaratory relief in connection with their claim that Puerto Rico Law No. 197, 1 P.R. Laws Ann. §§ 456 *et seq.*, "is unconstitutional to the extent that it purports to authorize or allow the transition process [for the next governor] to proceed before the next governor ... has been determined." We need not address this issue. The District Court denied preliminary injunctive relief on this claim, and the Rosselló Plaintiffs did not bother to appeal that ruling. Moreover, whether Law No. 197 allows the transition process to go forward during a recount is a question of local law that will soon be mooted by the recount.

FN17. We note that the Rosselló Plaintiffs chose to challenge the decisions of the Commission in federal court rather than exercise their statutory right to appeal to the Court of First Instance. *See* 16 P.R. Laws Ann. § 3016a.

FN18. The Suárez Plaintiffs also sought declaratory and injunctive relief requiring the Commission to (1) complete the general canvass before conducting a recount and (2) certify the winning gubernatorial candidate by December 22, 2004.

FN19. The Suárez Plaintiffs filed this action even though the Commission had already decided that the three-mark ballots are valid.

FN20. Significantly, the commissioner of the NPP, a defendant in the Suárez action, had requested dismissal on several grounds, one of which was lack of jurisdiction because the Commission had already adjudicated the contested ballots as valid.

FN21. Because of the disposition of the removal issue on other grounds, we need not address the alleged procedural defects.

FN22. We agree with the District Court

that the Supreme Court's judgment was void. The governing statute provides that the filing of "a copy of the notice [of removal] with the clerk of [the] State court ... effect[s] the removal and *the State court shall proceed no further* unless and until the case is remanded." 28 U.S.C. § 1446(d) (emphasis added). The Supreme Court received notice of the removal at 11:48 a.m. on November 20, 2004 but did not issue judgment until that evening. The judgment is thus, as the District Court found, a nullity.

FN23. We address the applicability of *Bonas* below in our discussion of the Rosselló action.

FN24. Respondents also note that the *Suárez* complaint attached and made reference to the complaint filed four days earlier in federal court by Rosselló. No federal claim can be inferred from this reference to the federal action; rather, it was included in the *Suárez* complaint as factual background. *See Suárez* complaint at para. 8. Further, even assuming it is proper for us to look outside the four corners of the *Suárez* complaint to the previously-filed federal action, as we discuss below, the Rosselló Complaint does not state a claim warranting federal intervention into this local electoral dispute, and therefore cannot be considered sufficiently substantial to give rise to removal jurisdiction under *Franchise Tax Board. See Almond v. Capital Props., Inc.,* 212 F.3d 20, 23 (1st Cir.2003).

FN25. We are aware of only one other case dealing with federal removal jurisdiction over a claim filed in state court with ambiguous references to constitutional provisions. In *Dardeau v. West Orange-Grove Consolidated I.S.D.,* 43 F.Supp.2d 722 (E.D.Tex.1999), a federal district court evaluated a situation very much like the one we face here. In *Dardeau,* a complaint was filed in state court that made explicit reference only to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))

state law, but also claimed a violation of "due process." Ambiguity with regard to the source of this right was heightened relative to our case because, while those words appear in the United States Constitution, the Texas Constitution uses the phrase "due course of law." *Id.* at 732. For reasons substantially similar to those we set out below, the district court nevertheless interpreted the complaint narrowly to find no federal cause of action to sustain removal jurisdiction. *Id.* at 730-34.

FN26. Although we are skeptical that the only purpose or effect of the injunction was to preserve jurisdiction, especially considering the fact that this "jurisdiction-preserving" injunction is still in place after approximately three weeks worth of "marathon hearings" on the merits, we find that our skepticism is irrelevant in light of the manner in which we resolve the case. Furthermore, although we believe that we properly review the non-adjudication order as an appealable interlocutory injunction pursuant to 28 U.S.C. § 1292(a)(1), we note that even if we were incorrect in this conclusion, we would, in the alternative, exercise our discretion to treat the Acevedo Defendants' notice of appeal as a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a), thus preserving our jurisdiction in any event. *See, e.g., United States v. Horn,* 29 F.3d 754, 769 (1st Cir.1994) ("We are fortified in our resolve to hear and determine this appeal by the knowledge that, even if no appeal lies as of right, we possess--and can appropriately exercise--the power of discretionary review via mandamus, to address the important question raised in this case.").

FN27. The standard for determining the existence of original federal jurisdiction under 28 U.S.C. § 1343 is, of course, much more liberal than the standard for determining the existence of removal jurisdiction under 28 U.S.C. § 1441, at least outside of the complete preemption

context. *See BIW Deceived,* 824 F.2d at 832.

FN28. We do not foreclose the possibility of a case in which federal intervention would be appropriate without a showing of disenfranchisement. The most obvious example of this would be a case involving vote dilution. *See Bush v. Gore,* 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (*per curiam* ) ("It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' ") (quoting *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). Here, however, the Rosselló Plaintiffs' claim that the Commission's "change in the rules" after the election somehow "diluted" their vote for their political party of choice is without merit because there was no clear rule prior to the election that the three-mark split ballots were invalid.
The Rosselló Plaintiffs' claim that the three-mark split ballots were adjudicated inconsistently on election night (and immediately thereafter), on the other hand, presents a much stronger claim for federal intervention without a showing of disenfranchisement. That claim, however is rendered moot by the fact that all ballots will be adjudicated in the same uniform manner during the recount. *See Bush v. Gore,* 531 U.S. at 106 (*per curiam* ) (addressing situation where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another.").

**Briefs and Other Related Documents (Back to top)**

• 04-2612 (Docket)
(Nov. 29, 2004)

• 04-2611 (Docket)
(Nov. 29, 2004)

• 04-2613 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2900370
--- F.3d ---
**(Cite as: 2004 WL 2900370 (1st Cir.(Puerto Rico)))**

Page 18

(Nov. 29, 2004)

• 04-2610  (Docket)

(Nov. 24, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   2

RECEIVED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

JAN 0 3 2005

KENNETH S. GARDNER, CLERK
PUBLIC SERVICE COUNTER

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 02-B02474 |
| KMART CORPORATION, et al., | ) | Hon. Susan P. Sonderby |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| KMART CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 04-A02556 |
| | ) | |
| v. | ) | |
| | ) | |
| HARVARD REAL ESTATE- | ) | |
| ALLSTON, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPPOSITION OF HARVARD REAL ESTATE-ALLSTON, INC. TO KMART CORPORATION'S MOTION TO DISMISS WITHOUT PREJUDICE

Harvard Real Estate-Allston, Inc. ("Harvard") hereby opposes Kmart Corporation's

Motion to Dismiss Without Prejudice the instant adversary proceeding. Kmart is not entitled to

dismissal of its complaint without prejudice. Kmart has offered no worthy explanation for

dismissal of this case without prejudice.

Harvard submits that any dismissal of this adversary proceeding should be *with* prejudice.

Not only is this Court's jurisdiction over the claims raised in Count I of Kmart's May 5, 2004

Adversary Proceeding Complaint ("Complaint") "questionable at best", but the issues raised in

that count of the Complaint are not justiciable; they are moot. As to Count II of the Complaint,

Kmart is not entitled to a dismissal without prejudice, as it has failed to establish any grounds

{J:\CLIENTS\iit\082302\0116\00494097.DOC;1}

therefor as required by Fed. R. Civ. P. 41(a)(2).[1]  In seeking the dismissal without prejudice of its Complaint, Kmart completely mischaracterizes the nature of the summary process (eviction) action currently pending in Massachusetts and misleads this Court as to the positions asserted by Harvard in that summary process action.

For the reasons stated herein, the Court should deny Kmart's Motion to Dismiss Without Prejudice.  The Court should, however, dismiss Count I of the Complaint *with* prejudice and either (i) enter final judgment in Harvard's favor on Count II of the Complaint or (ii) schedule Count II for a trial on the merits so that this matter is finally adjudicated.

In support of its opposition, Harvard states:

## NATURE AND STATUS OF PROCEEDINGS

1.      Kmart commenced this adversary proceeding in May 5, 2004 by filing a two-count "Complaint for Declaratory and Injunctive Relief".  In the Complaint, Kmart asserted that the Bankruptcy Court had jurisdiction over the action pursuant to 28 U.S.C. § 1334(b), Complaint, ¶ 2, that the claims alleged in the Complaint were core matters pursuant to 28 U.S.C. § 157(b)(2), Complaint, ¶ 4, and that this Court had "exclusive jurisdiction to adjudicate any and all adversary proceedings that may be commenced or maintained pursuant to Kmart's Chapter 11 cases, [its First Amended Plan of Reorganization] ("Plan") or that were the subject of proceedings before the Bankruptcy Court prior to the April 6, 2003" effective date of the Plan ("Effective Date"), Complaint, ¶ 3.[2]

2.      In Count I of the Complaint, Kmart sought a declaration by the Court that precluded Harvard "from attempting, on the basis of defaults that were or could have been raised

---

[1] Kmart never communicated with Harvard regarding dismissal of the case pursuant to Fed. R. Civ. P. 41(a)(1).

[2] In its Answer to the Complaint, Harvard noted the questionability of the Court's jurisdiction (Answer, ¶ 2) and contested Kmart's designation of this adversary proceeding as a core matter (Answer, ¶ 4).

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

in the Assumption Objection and that were resolved by the order dismissing the Assumption Objection and the Confirmation Order, to terminate the lease or to evict Kmart." Complaint, ¶ 29. In Count II of the Complaint, Kmart sought a declaration from the Court that an April 23, 2004 Notice to Vacate/Notice of Termination ("Termination Notice") that Harvard caused to be sent to Kmart constituted a violation of the discharge injunction contained in the Court's April 22, 2003 order confirming the Debtor's Plan ("Confirmation Order"). Complaint, ¶ 33.

3.      On May 5, 2004 Kmart also filed a request for a temporary restraining order and a preliminary injunction ("Request for Injunctive Relief") to enjoin Harvard from pursuing its post-Effective Date rights and remedies with respect to a lease ("Lease") of premises known as the Brighton Mills Shopping Center. The Court conducted an evidentiary hearing on Kmart's Request for Injunctive Relief on June 4, 2004, heard testimony of witnesses presented both by Kmart and Harvard, accepted various exhibits, observed demonstrative evidence presented by Harvard and heard the oral arguments of counsel for the parties. Following the full day evidentiary hearing Harvard and Kmart both submitted proposed findings of fact and conclusions of law. On September 29, 2004 the Court entered its ruling on Kmart's Request for Injunctive Relief, and, in denying that requested relief, found that its jurisdiction over Count I of the Complaint was "questionable at best", Tr. p. 11, and that it was more appropriate for Kmart to raise its affirmative defenses to an eviction action in a state court proceeding. Tr. p. 12.[3] Kmart did not appeal the Court's ruling denying its Request for Injunctive Relief.

4.      In October 2004, Harvard served Kmart with Interrogatories, Requests for Production of Documents and Requests for Admission. Kmart responded to some of Harvard's Requests for Admission, objected to many other substantive requests, and filed a Motion to Stay

---

[3] The transcript of the Court's September 29, 2004 ruling on Kmart's request for injunctive relief is attached as Appendix "A" to Harvard's Opposition to Kmart's Motion to Stay Proceedings [A.P. Docket No. 34].

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

- 3 -

Proceedings.  On November 19, 2004 Kmart also filed a generic objection to Harvard's

Interrogatories and Request for Production of Documents on the grounds that consideration of its

Motion to Stay Proceedings would obviate the need for responding to that discovery.  Kmart then

filed its Motion to Dismiss Without Prejudice ("Motion to Dismiss").[4]

      5.      On October 6, 2004 Harvard commenced a summary process (eviction) action

("Summary Process Action") in the Massachusetts Trial Court, Boston Municipal Court,

Brighton Division.  On October 25, 2004 Kmart filed with the United States District Court for

the District of Massachusetts a Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446

("Notice of Removal") (See Declaration of Sherri L. Johnson attached as Appendix

("Appendix") Exhibit "A").  In the Notice of Removal, Kmart alleged that the Federal District

Court had original jurisdiction of the Summary Process Action because of diversity of

citizenship, Notice of Removal, Section II, ¶ 2(i), and alleged that the amount in controversy

exceeded $75,000.00, Notice of Removal, Section II, ¶ 2(ii).  Kmart further alleged in the Notice

of Removal that jurisdiction in the Federal District Court was founded on the existence of a

federal question.  Notice of Removal, Section II, ¶ 3(ii) and (iii).  On November 22, 2004 Kmart

filed in the Massachusetts Federal District Court an "Amended Answer, Counterclaim, and

Demand for Jury Trial" ("Answer and Counterclaim").  In its Answer and Counterclaim, Kmart

asserted eight affirmative defenses ("Defenses"), including res judicata/claim preclusion,

collateral estoppel/issue preclusion, and waiver, and asserted three counterclaims (collectively,

the "Counterclaims"):  one sought a declaration that the Termination Notice contravened the

Bankruptcy Code, a second counterclaim sought a declaration that the Termination Notice and

the Summary Process Action violated the Confirmation Order, and the third counterclaim sought

---

[4] Other than prosecuting its Request for Injunctive Relief Kmart has taken no action to advance this declaratory judgment proceeding to trial.

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

- 4 -

a determination that Harvard's actions contravened 11 U.S.C. § 365. Nowhere in its 16-page

Answer and Counterclaim did Kmart apprise the Federal District Court of the pending adversary

proceeding it had initiated in this Court.

      6.     Because Massachusetts law prohibits the assertion of counterclaims in a

commercial summary process action, Harvard promptly moved to dismiss the Counterclaims. A

true, correct and complete copy of Harvard's Motion to Dismiss Kmart's Counterclaims is

attached hereto as Exhibit B to the Appendix. Harvard also moved promptly in the Federal

District Court to remand the Summary Process Action to the Massachusetts State Court. As

grounds for that remand, Harvard noted the obvious misstatement of facts and misapplication of

the law in Kmart's Notice of Removal and exposed Kmart's attempt to manufacture both

diversity jurisdiction and federal question jurisdiction in the Federal court.[5] A true, correct and

complete copy of Harvard's Motion to Remand is attached hereto as Exhibit C to the Appendix.

      7.     Kmart next filed with this Court a Motion to Stay Proceedings. Then, days before

the hearing on that motion, Kmart filed its Motion to Dismiss. Without citing *any* statutory

provision or case law in support of its Motion to Dismiss, and, notwithstanding Fed. R. Civ. P.

11 implications, Kmart alleged that:

> In its pleadings filed in the Boston court, Harvard asserts that the
> court cannot hear the *res judicata* and collateral estoppel *defenses*
> because those *defenses* are pending in this adversary proceeding
> even though this Court has ruled that the *defenses* should be raised
> in a Massachusetts court. Plainly, Harvard is attempting to
> preclude Kmart altogether from asserting those *defenses* in any
> forum. (emphasis added.)

---

[5] It is well settled that federal question jurisdiction cannot be based upon a federal question defense or counterclaim. See Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 476 (1998); Caterpillar, Inc. v. Williams, 482 U.S. 386, 399 (1987).

Motion to Dismiss, ¶ 5.[6]  Kmart admits that it probably will refile the Complaint in this Court if

its defenses in the Summary Process Action are unavailing.  Motion to Dismiss, ¶ 6.  Harvard

has not attempted to strike any of Kmart's affirmative defenses, and for the reasons set forth

below the Court should deny Kmart's Motion to Dismiss.  Instead, the Court should dismiss

Count I of the Complaint *with* prejudice and either enter judgment on Harvard's behalf on Count

II of the Complaint or schedule that count for a trial on the merits.

## APPLICABLE LAW

8.      Fed. R. Civ. P. 41(a)(2) provides in pertinent part:

> (2) *By Order of Court.*  Except as provided in paragraph (1) of this
> subdivision of this rule, *an action shall not be dismissed at the
> plaintiff's instance save upon order of the court and upon such
> terms and conditions as the court deems proper.*  If a
> counterclaim has been pleaded by a defendant prior to the service
> upon the defendant of the plaintiff's motion to dismiss, the action
> shall not be dismissed against the defendant's objection unless the
> counterclaim can remain pending for independent adjudication by
> the court.  Unless otherwise specified in the order, a dismissal
> under this paragraph is without prejudice.  (emphasis added)

9.      M.G.L. c. 239 and the Massachusetts Uniform Summary Process Rules do not

permit the assertion of counterclaims in a commercial summary process action.   See

Farfard v. Lincoln Pharmacy of Milton, Inc., 439 Mass. 512, 515 (2003).  "[S]ummary process is

a purely statutory procedure and can be maintained only in the instances specifically provided for

in the statute."  Cummings v. Wajda, 325 Mass. 242, 243 (1950).[7]

---

[6] Obviously, Kmart confuses defenses with counterclaims.  Kmart's assertion of counterclaims in light of
the clear prohibition embodied in Mass. G.L. c.239, § 8A, Uniform Summary Process Rule 5, and prior Supreme
Judicial Court decisions raises F. R. Civ. P. 11 issues.  It appears obvious to Harvard that Kmart's pleading of the
Counterclaims is an attempt to manufacture federal removal jurisdiction for the Summary Process Action.  Under
any analysis, Kmart's assertion of the Counterclaims in the Summary Process Action is frivolous and presented to
cause unnecessary delay or needlessly increase Harvard's costs of litigation.

[7] M.G.L. c. 239 and the Massachusetts Uniform Summary Process Rules permit the defendant in a
*residential* summary process action to assert certain counterclaims, but do not authorize counterclaims in a
commercial summary process action.  Golden v. General Builders Supply, LLC, 441 Mass. 652, 658n.4 (2004);
Fafard v. Lincoln Pharmacy of Milford, Inc., 439 Mass. 512 (2003).  Thus, in those circumstances where the special

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

## ARGUMENT

**A.    Kmart's Motion to Dismiss Without Prejudice should be denied.**

10.    Kmart cannot establish that it is entitled to a dismissal without prejudice. F.R. Civ. P. 41(a)(2) requires that a plaintiff establish that a voluntary dismissal without prejudice is warranted. Tolle v. Carroll Touch, Inc., 23 F.3rd 174, 177 (7th Cir. 1994). "Without such a demonstration, an action *shall not* be dismissed at the request of a plaintiff." Tolle, supra, at 177-178 (emphasis added). It is an abuse of discretion to dismiss an action without prejudice where the defendant will suffer "plain legal prejudice". United States v. Outboard Marine Corp., 789 F.2d 487, 502 (7th Cir. 1986), *cert. denied*, 479 U.S. 961 (1986). Among the factors to be considered in determining whether a defendant has suffered legal prejudice are:  the defendant's effort and expense of preparation for trial, lack of diligence on the part of the plaintiff in prosecuting the action and insufficient explanation for the need to take a dismissal. United States v. Outboard Marine Corp., 789 F.2d at 502, citing Tyco Laboratories, Inc. v. Koppers Co., Inc., 627 F.2d 54, 56 (7th Cir. 1980). Harvard will suffer "plain legal prejudice" if Kmart is allowed to voluntarily dismiss its Complaint without prejudice.

11.    Kmart's rationale for dismissing the adversary proceeding is based on its stated desire to refile its Complaint if its Defenses are unavailing in the Summary Process Action. In its Motion to Dismiss, Kmart states: "If the Massachusetts Court declines to hear the defenses, a dismissal with [sic] prejudice will allow Kmart to refile its complaint in this case." Motion to Dismiss, ¶ 6. Kmart is looking for multiple bites at the apple. If it loses the Summary Process

---

concerns arising in leased residential premises are not present, this limitation is intended to allow a speedy mechanism to permit the owner of real property to regain possession "based on the notion that real estate constitutes unique property and that because it generates income, time lost in regaining it from a party in illegal possession can represent an irreplaceable loss to the owner [which the] legislature clearly recognized … in creating a special chapter of the General Laws establishing a 'summary' procedure." Commentary to Rule 1 of Uniform Summary Process Rules. That said, Massachusetts courts have not prohibited commercial summary process defendants from raising *defenses*.

{J:\CLIENTS\li\082302\0116\00494097.DOC;1}

Action, it will come back to this Court. This type of forum shopping has been routinely condemned by the courts and is clearly improper. Tolle, supra at 178; Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 187 F.R.D. 941, 950-51 (8th Cir. 1999) ("a party is not permitted to dismiss merely to escape an adverse decision nor to seek a more favorable forum"), citing, Holmgren v. Massey-Ferguson, Inc., 516 F. 2d. 856, 857 n. 1 (8th Cir. 1975) and International Shoe Co. v. Cool, 154 F. 2d 778, 780 (8th Cir.), cert. denied 329 U.S. 726 (1946) ; Horton v. TWA Corp., 169 F.R.D. 11, 17 (E.D.N.Y. 1996) (citing "undue vexatiousness" on plaintiff's part as additional factor to be considered); Kennedy v. State Farm Mutual Automobile Ins. Co., 46 F.R.D. 12, 15-16 (E.D.Ark. 1969)(court denied request for voluntary dismissal where plaintiff was seeking to move the case to a different forum with a more favorable body of substantive law); Southern Maryland Agricultural Association of Prince George's County v. United States, 16 F.R.D. 100, 102 (D.Md. 1954) ("[t]his type of forum shopping has no sanction.")

12.      Contrary to the allegations in its Complaint[8], Kmart recently asserted in the Summary Process Action that it "*is seeking to litigate all issues before [the United States District Court for the District of Massachusetts], and not in the Bankruptcy Court.*" Appendix, Exhibit "D," p. 2 (emphasis added). If Kmart's representations in the Summary Process Action are true, there is no reason why the Complaint should be dismissed without prejudice. Kmart's sole rationale for dismissal of its Complaint without prejudice is so that it can refile the case if it is unsuccessful in the Summary Process Action. Harvard should not be put in the position of having the Damocles' Sword of future litigation in this Court hanging over its head. Harvard will suffer "plain legal prejudice" if the Complaint is dismissed without prejudice. See Horton v. TWA Corp., 169 F.R.D. 11, 17 (E.D.N.Y. 1996).

---

[8] Complaint, ¶4: "This is a core matter under 28 U.S.C. § 157 (b)(2) because this matter: (i) concerns the administration of the bankruptcy case; (ii) arises from an order confirming a plan of reorganization; and (iii) affects the adjustment of a debtor-creditor relationship."

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

13.    Harvard has spent thousands of dollars in legal fees defending the frivolous allegations in the Complaint and litigating Kmart's ill-fated Request for Injunctive Relief. It should not have to spend thousands of dollars more should Kmart decide to refile the Complaint at some later date. See Rodriguez v. Marks Brothers Pickle Company, Inc., 102 F.R.D. 104 (E.D. Wis. 1984). In preparation for the hearings on Kmart's Request for Injunctive Relief Harvard deposed Kmart's witnesses and otherwise expended great effort in defending against Kmart's spurious claims. Harvard's witnesses and its counsel traveled to Chicago from Massachusetts. Scores of products sold by Kmart as "groceries" were shipped to Chicago for use as exhibits. Following the denial of Kmart's request for a preliminary injunction, Harvard served Requests for Admission, Interrogatories and Requests for Production of Documents upon Kmart. This Court should take note of the fact that Kmart chose this forum in which to litigate its spurious claims against Harvard, that Kmart has taken no action to move this declaratory judgment matter toward a final determination, that Kmart has failed to respond to Harvard's discovery requests and seeks to avoid its obligations under the discovery rules by dismissing its Complaint, and that it will refile a complaint in this Court if an adverse decision is rendered against it in the Summary Process Action. Clearly, Harvard will sustain "plain legal prejudice" if this Court were to allow the Motion to Dismiss. Clearly, if this Court applies the factors enunciated in Outboard Marine Corp., Kmart's Motion to Dismiss should be denied.

**B.    Count I is moot, and if that count is to be dismissed it should be dismissed *with* prejudice.**

14.    Harvard does not oppose the dismissal of Count I of the Complaint, but *does* oppose the dismissal of that Count without prejudice. It is clear from the evidence presented at the June 4, 2004 evidentiary hearing on Kmart's Motion for Injunctive Relief and from the Court's September 29, 2004 ruling denying that injunctive relief that (i) the Court does not

believe it has jurisdiction to provide the relief requested in Count I of the Complaint, (ii) the joinder of issues in the Summary Process Action renders the relief requested in Count I of the Complaint moot, and there is no justiciable issue for this Court to determine, and (iii) after institution of the Summary Process Action this Court cannot "preclude [Harvard] from attempting ... to terminate the lease or to evict Kmart." Count I should be dismissed *with* prejudice.

15.     Kmart sought a declaration from this Court that the Confirmation Order precludes Harvard from attempting to terminate its lease of the Brighton Mills Shopping Center space or otherwise to evict Kmart from that space. By the plain language of its Complaint, Kmart asked this Court to prevent Harvard from initiating the Summary Process Action. Because the Summary Process Action has been commenced, however, there is no longer any issue to be determined by this Court as respects Count I. The Court cannot preclude Harvard from taking action which it has taken already. Moreover, this Court already has questioned whether it has jurisdiction over Count I of the Complaint. The Court's uncertainty of its jurisdiction in and of itself compels dismissal of the Complaint. See, Taylor v. Commonwealth of Virginia, Dept. of Trans., 170 F.R.D. 10, 12 (E.D. Va. 1996) (when the court has reason to doubt that it has subject matter jurisdiction, dismissal is required and there is simply no discretion to be exercised). Count I should be dismissed with prejudice.

C.     **The Court should either enter judgment on Harvard's behalf on Count II of the Complaint or schedule that matter for trial.**

16.     As to Count II of the Complaint, the Court either should enter judgment on Harvard's behalf or schedule the issue raised in Count II of the Complaint for trial. As noted above, in Count II of its Complaint Kmart seeks a declaration from the Court that the April 23, 2004 Termination Notice and the commencement of the Summary Process Action constitute a

violation of the discharge injunction set forth in the Confirmation Order. Harvard is entitled to judgment on that Count as a matter of law. This Court impliedly found when it denied Kmart's Request for Injunctive Relief that no violation of the Confirmation Order had occurred when Harvard sent the Termination Notice.[9] And, in viewing Kmart's prayer for relief in Count II of the Complaint as a motion to hold Harvard in contempt for violating the discharge injunction, Tr. p. 13, despite the day-long evidentiary hearing on June 4, 2004 and the submission of extensive briefs on the issue, the Court found that Kmart had failed to sustain its burden of establishing a likelihood of success on the merits of its claim. Rather than dismiss Count II of the Complaint without prejudice, the Court should enter judgment for Harvard. Kmart, despite a full evidentiary hearing, failed to produce a scintilla of evidence of any violation of the Confirmation Order by Harvard. Kmart having presented its evidence at the June 4, 2004 hearing and having failed to convince the Court that there was a likelihood that it would prevail on its Count II claim, Harvard is entitled to judgment on that Count.[10]

17.     If, however, the Court is not inclined to enter judgment on Count II of the Complaint in Harvard's behalf the Court should not dismiss Count II without prejudice. Clearly, Kmart's attempt to dismiss Count II of the Complaint without prejudice is designed to subject Harvard to the spectre of further litigation in this Court once Kmart fails to defend itself successfully in the Summary Process Action. See Kennedy, 46 F.R.D. 12; Rodriguez v. Marks Brothers Pickle Co., 102 F.R.D. 104 (E.D. Wis. 1984). See also Hamm, supra at 950-51

---

[9] Had this Court determined that the Termination Notice constituted a violation of the discharge injunction, it would have allowed the injunctive relief requested by Kmart "to protect the effectiveness of this court's orders." Tr. p. 14.

[10] That Kmart's allegations in Count II of the Complaint are vexatious and devoid of any merit whatsoever is conclusively demonstrated by the fact that Harvard, by its "Motion of Harvard Real Estate-Allston, Inc. to Confirm Authority to Pursue State Law Remedies Re: Post-Effective Date Lease Obligations of Debtor", apprised this Court in early March 2004 of its intent to pursue its state law rights and remedies against Kmart as a result of Kmart's on-going, post-Effective Date lease defaults.

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

(dismissal denied where plaintiff attempting to escape an unfavorable forum by moving under Rule 41(a)(2)).  Moreover, insofar as the prayer for relief in Count II of the Complaint seeks a declaration that Harvard has violated an order of this Court, to wit the Confirmation Order, this Court, not the court determining the Summary Process Action, is the appropriate forum for that determination to be made.  See, Hastert v. Illinois Board of Elections, 28 F.3d 1430, 1438 (7th Cir. 1993)("The district court is in the best position to interpret its own orders"); Matter of VMS Securities Litigation, 103 F.3d 1317, 1321 (7th Cir. 1996) (same); In re Thornburg, 277 B.R. 719, 725 (E.D.Tex. 2002)("The bankruptcy court is in the best position to interpret its own orders. … Bankruptcy Court has jurisdiction to clarify and enforce its own orders under 11 U.S.C. § 105(a) and is the best court to do so." (internal citations and quotations omitted)) .  Again, from the Court's September 29, 2004 ruling on Kmart's Request for Injunctive Relief it is clear that this Court does not believe that Harvard has violated the discharge injunction set forth in the Confirmation Order.

WHEREFORE, Harvard Real Estate-Allston, Inc. prays that the Court deny Kmart's Motion to Dismiss Without Prejudice, that the Court dismiss with prejudice Count I of the Complaint, that the Court either enter judgment on Harvard's behalf as to Count II of the Complaint or schedule for trial in this Court the issue whether the Termination Notice violated the discharge injunction set forth in the Confirmation Order, and that the Court grant Harvard such further relief as is proper and just.

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}

- 12 -

Respectfully submitted,

HARVARD REAL ESTATE-ALLSTON, INC.
By its attorneys,


_____
Michael S. Terrien
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611
Tel: (312) 222-9350
Fax: (312) 527-0484

Richard A. Sheils, Jr. (BBO # 457290)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA  01601-0156
Tel: (508) 926-3432
Fax: (508) 929-3047


DATED:  January 3, 2005

{J:\CLIENTS\lit\082302\0116\00494097.DOC;1}